**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION**

| | | |
|---|---|---|
| **SAMUEL R. BALLENGEE,** | : | |
| | : | |
|    **Plaintiff,** | : | |
| | : | |
| **v.** | : | **Civil Action No. 2:17-cv-00212** |
| | : | |
| **CBS BROADCASTING INC., et al.,** | : | |
| | : | |
|    **Defendants.** | : | |

**MEMORANDUM OF LAW IN SUPPORT OF
<u>DEFENDANTS' MOTION TO DISMISS</u>**

Thomas V. Flaherty (WVSB #1213)
FLAHERTY SENSABAUGH BONASSO PLLC
200 Capitol Street
P.O. Box 3843
Charleston, WV 25338-3843
Tel: (304) 345-0200
Fax: (304) 345-0260
tflaherty@flahertylegal.com

Michael D. Sullivan*
Jay Ward Brown*
Maxwell S. Mishkin*
LEVINE SULLIVAN KOCH & SCHULZ, LLP
1899 L Street NW, Suite 200
Washington, DC 20036
Tel: (202) 508-1100
Fax: (202) 861-9888
msullivan@lskslaw.com
jbrown@lskslaw.com
mmishkin@lskslaw.com

*Counsel for Defendants*

*Visiting Attorneys

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................................... ii

PRELIMINARY STATEMENT ..................................................................................................1

FACTUAL BACKGROUND .........................................................................................................2

I.      PRIOR LEGAL PROCEEDINGS AGAINST PLAINTIFF.................................................2

II.     THE CBS NEWS REPORTS ...........................................................................................3

       A.     The January Report ...............................................................................................4

       B.     Events Between The January And May Reports ....................................................5

       C.     The May Report ....................................................................................................6

III.    THE COMPLAINT IN THIS ACTION ...........................................................................7

ARGUMENT .................................................................................................................................8

I.      PLAINTIFF'S DEFAMATION CLAIM FAILS AS A MATTER OF LAW ...................8

       A.     The Only Statements In The Reports Actually About Ballengee Or
             His Pharmacy Are True And Privileged ...............................................................9

       B.     Ballengee Cannot Plead Or Prove A Claim For Defamation-By-
             Implication For Two Reasons ..............................................................................11

II.     PLAINTIFF'S FALSE LIGHT CLAIM FAILS AS A MATTER OF LAW
       FOR MULTIPLE REASONS ..........................................................................................14

III.    PLAINTIFF FAILS TO STATE A CLAIM FOR TORTIOUS
       INTERFERENCE ...........................................................................................................17

IV.    PLAINTIFF'S EMOTIONAL DISTRESS CLAIM ALSO FAILS AS A
       MATTER OF LAW .........................................................................................................19

V.     PLAINTIFF FAILS TO STATE ANY CLAIM AS TO SCOTT PELLEY .....................20

CONCLUSION ............................................................................................................................20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*American Chiropractic Association, Inc. v. Trigon Healthcare, Inc.*,
    367 F.3d 212 (4th Cir. 2004) ..................................................................4

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)................................................................................8

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007)................................................................................8

*Bell v. National Republican Congressional Committee*,
    187 F. Supp. 2d 605 (S.D. W. Va. 2002)................................................15

*Biro v. Conde Nast*,
    807 F.3d 541 (2d Cir. 2015)....................................................................15

*Brown & Williamson Tobacco Corp. v. Jacobson*,
    713 F.2d 262 (7th Cir. 1983) ..................................................................18

*Brown v. CVS Pharmacy, LLC*,
    982 F. Supp. 2d 793 (M.D. Tenn. 2013).................................................15

*Carper v. Clay County Board of Health*,
    2015 WL 4163277 (S.D. W. Va. July 9, 2015) ......................................19

*Chapin v. Knight-Ridder, Inc.*,
    993 F.2d 1087 (4th Cir. 1993) ..................................................11, 12, 13

*Crump v. Beckley Newspapers, Inc.*,
    320 S.E.2d 70 (W. Va. 1983)........................................................9, 12, 14

*Cruse v. Frabrizio*,
    2014 WL 3045412 (S.D. W. Va. July 2, 2014) ....................4, 10, 13, 19

*Cunningham Energy, LLC v. Outman*,
    2013 WL 5274361 (S.D. W. Va. Sept. 18, 2013) .............................9, 13

*Daily Gazette Co. v. West Virginia Board of Medicine*,
    352 S.E.2d 66 (W. Va. 1986)..................................................................15

*Dodds v. ABC, Inc.*,
    145 F.3d 1053 (9th Cir. 1998) ................................................................12

*Doe 2 v. Associated Press*,
   331 F.3d 417 (4th Cir. 2003) ...................................................................15

*Duncan v. Gilead Sciences, Inc.*,
   2011 WL 1807017 (S.D. W. Va. May 9, 2011)......................................................13

*Ferrell v. Rose*,
   No. 101557 (W. Va. May 27, 2011) ...............................................................18

*Hatfield v. Health Management Associates of West Virginia, Inc.*,
   672 S.E.2d 395 (W. Va. 2008)..................................................................17

*Hatfill v. New York Times Co.*,
   532 F.3d 312 (4th Cir. 2008) ...................................................................19

*Hinerman v. Daily Gazette Co.*,
   423 S.E.2d 560 (W. Va. 1992)..................................................................10

*Huggins v. Povitch*,
   1996 WL 515498 (N.Y. Sup. Ct. Apr. 19, 1996)....................................................18

*Hustler Magazine, Inc. v. Falwell*,
   485 U.S. 46 (1988)............................................................................19

*Landmark Communications, Inc. v. Virginia*,
   435 U.S. 829 (1978)...........................................................................15

*Liberty Mutual Fire Insurance Co. v. JM Smith Corp.*,
   602 F. App'x 115 (4th Cir. 2015) ...............................................................20

*Mayfield v. NASCAR, Inc.*,
   674 F.3d 369 (4th Cir. 2012) ...........................................................8, 15, 16

*Michel v. NYP Holdings, Inc.*,
   816 F.3d 686 (11th Cir. 2016) ..................................................................15

*Mullins v. Ethicon, Inc.*,
   2016 WL 6836941 (S.D. W. Va. Nov. 18, 2016) ....................................................2

*Pippen v. NBCUniversal Media, LLC*,
   734 F.3d 610 (7th Cir. 2013) ...................................................................15

*Reuber v. Food Chemical News, Inc.*,
   925 F.2d 703 (4th Cir. 1991) ...................................................................16

*Schatz v. Republican State Leadership Committee*,
   669 F.3d 50 (1st Cir. 2012)....................................................................15

*Seminole Tribe of Florida v. Times Publishing Co.*,
   780 So. 2d 310 (Fla. 4th DCA 2001) .....................................................................18

*Smith v. Teach*,
   2009 WL 1974304 (N.D. W. Va. July 7, 2009).......................................................17

*Spacecon Specialty Contractors, LLC v. Bensinger*,
   713 F.3d 1028 (10th Cir. 2013) .............................................................................16

*Taylor v. West Virginia Department of Health & Human Resources*,
   788 S.E.2d 295 (W. Va. 2016)...............................................................................15

*Thomas v. Los Angeles Times Communications, LLC*,
   189 F. Supp. 2d 1005 (C.D. Cal. 2002) .................................................................13

*Tiernan v. Charleston Area Medical Center, Inc.*,
   506 S.E.2d 578 (W. Va. 1998)..........................................................................17, 18

*Travis v. Alcon Laboratories, Inc.*,
   504 S.E.2d 419 (W. Va. 1998)...............................................................................19

*Tug Valley Pharmacy, LLC v. All Plaintiffs Below In Mingo County*,
   773 S.E.2d 627 (W. Va. 2015)..................................................................1, 2, 3, 10

*Walker v. Kelly*,
   589 F.3d 127 (4th Cir. 2009) ...................................................................................2

*White v. Fraternal Order of Police*,
   909 F.2d 512 (D.C. Cir. 1990)...............................................................................13

*Witthohn v. Federal Insurance Co.*,
   164 F. App'x 395 (4th Cir. 2006) ..........................................................................10

**Other Authorities**

Restatement (Second) of Torts

   § 611...................................................................................................................10

   § 766 ..................................................................................................................18

   § 772 ..................................................................................................................17

Federal Rule of Civil Procedure 12(b)(6) ......................................................................8

iv

## PRELIMINARY STATEMENT

Plaintiff Samuel Ballengee, a pharmacist and former owner of Tug Valley Pharmacy in Mingo County, claims in this lawsuit that he was defamed by two CBS Evening News reports that, he alleges, falsely accuse him of improperly filling prescriptions for opioids.  Ballengee filed this lawsuit notwithstanding the undisputed facts that (1) Tug Valley Pharmacy and Ballengee personally were and still are defendants in a series of lawsuits alleging that they caused or contributed to the plaintiffs' addiction to prescription painkillers by improperly filling prescriptions for opioids; and (2) when deposed in that litigation, Ballengee admitted that he had filled 150 to 200 prescriptions *per day* from one Mingo County medical practice alone – a medical practice that was later "the subject[] of an FBI raid which revealed violations of federal and state law for improperly prescribing controlled substances."  *Tug Valley Pharmacy, LLC v. All Plaintiffs Below In Mingo Cty.*, 773 S.E.2d 627, 629 (W. Va. 2015).  Indeed, it also is undisputed that, after defendants here reported these true facts to the public, the nation's largest wholesale drug distributor undertook its own investigation of Tug Valley Pharmacy and concluded that it could not legally continue to supply prescription pain pills to Ballengee.

Rather than acknowledge the impact of his own conduct – and notwithstanding the words *actually* used by defendants to accurately describe that conduct – Ballengee now seeks to place the blame for his business problems on the two CBS Evening News reports at issue, purporting to allege causes of action for defamation, false light invasion of privacy, interference with contracts, and intentional infliction of emotional distress.  Each of these claims, however, fails as a matter of law for multiple reasons.  Most importantly, Ballengee has not identified a *single* false statement of fact about him in either of the broadcasts.  Instead, he alleges that the broadcasts convey a web of allegedly false implications about him.  But a plaintiff alleging defamation-by-implication must both plead and prove that the challenged publication is

1

*reasonably* capable of conveying the supposed implication and that the *actual content* of the publication demonstrates on its face that the defendant intended or endorsed that implication. These are questions of law for the Court that are appropriately resolved on a preliminary motion. Defendants respectfully submit that, after reviewing the two news reports at issue, it will be apparent that Ballengee cannot meet these burdens as a matter of law.  For this and the additional reasons discussed below, all of Ballengee's claims should be dismissed with prejudice.

<u>**FACTUAL BACKGROUND**</u>

**I.      PRIOR LEGAL PROCEEDINGS AGAINST THE PLAINTIFF**

Plaintiff Samuel "Randy" Ballengee owned and operated Tug Valley Pharmacy (the "Pharmacy") in Williamson from 2007 until 2016.  Complaint ("Compl.") ¶ 26, Jan. 6, 2017, Dkt. 1.  Beginning in 2010, Ballengee and the Pharmacy were named in a series of lawsuits brought in Mingo County alleging that they had caused or contributed to the plaintiff patients' addiction to controlled substances.  *Id.* ¶ 32; *see also Tug Valley Pharmacy*, 773 S.E.2d at 629.[1] Co-defendants in those suits include other local pharmacies and a group of doctors who worked at the nearby Mountain Medical Center.  Compl. ¶ 32.  The lawsuits were consolidated for the purposes of a certified question to the West Virginia Supreme Court of Appeals as to whether the patients' own "wrongful conduct" barred the actions, a proposition that Court rejected in May 2015, holding that the lawsuits could proceed.  *Tug Valley Pharmacy*, 773 S.E.2d at 636-37.  The patients' brief on that question cited testimony from one pharmacist to the effect that Tug Valley Pharmacy had "refilled narcotic prescriptions too early, particularly if pay was in cash," and that the Pharmacy was "improperly filling prescriptions simultaneously for class 3 and 4 narcotics."

---

[1] "[A] federal court may consider matters of public record such as documents from prior state court proceedings in conjunction with a Rule 12(b)(6) motion."  *Walker v. Kelly*, 589 F.3d 127, 139 (4th Cir. 2009); *accord, e.g.*, *Mullins v. Ethicon, Inc.*, 2016 WL 6836941, at *1 n.3 (S.D. W. Va. Nov. 18, 2016) (Goodwin, J.).

*See* Ex. 6 at *12 (relevant pages of Respondents' Brief).  Moreover, when Ballengee was deposed in that litigation in January 2011, he testified that, when the Mountain Medical Center was still active, he filled between 150 and 200 narcotics prescriptions per day from that medical practice alone.  Ex. 7 at 47:3-7 (relevant pages of deposition transcript); *see also* Ex. 6 at *11. As the Supreme Court of Appeals observed, "Ultimately, the Mountain Medical Center and their physicians were the subjects of an FBI raid which revealed violations of federal and state law for improperly prescribing controlled substances.  Certain of the physicians' medical licenses were revoked and some pled guilty to and served time for the federal offenses." *Tug Valley Pharmacy*, 773 S.E.2d at 629.  The civil suits against Ballengee and the Pharmacy remain pending.  *See* Compl. ¶ 39.  Separately, in West Virginia's lawsuit against opioid distributors, the State described Tug Valley Pharmacy as "among the most notorious of the pill mill pharmacies in Southern West Virginia."  Ex. 11 at 31 (relevant portions of State's complaint).

## II.    THE CBS NEWS REPORTS

Defendants CBS Broadcasting Inc. and CBS News Inc. produce and distribute the nightly CBS Evening News broadcast.  *See* Compl. ¶¶ 7-8, 11-12.  On January 7, 2016, they broadcast a news story produced by defendant Ashley Velie and reported by defendant Jim Axelrod (all defendants together, "CBS") about the ongoing opioid epidemic in West Virginia, a report that mentions, among others, Ballengee and his Pharmacy (the "January Report").  *Id.* ¶ 44.  On May 25, 2016, CBS broadcast a follow-up report regarding the epidemic that likewise mentions Ballengee and the Pharmacy (the "May Report").  *Id.* ¶ 96.  Video copies of the two Reports are attached to the Complaint as parts of Exhibits A and B, and, for the Court's convenience, a DVD containing copies of them is attached as Exhibit 1 to the Motion to Dismiss.  In addition, a court reporter's certified transcripts of the two Reports are attached as Exhibits 2 and 3.  Furthermore,

Exhibits 4 and 5 consist of a combination of the court reporter's transcripts with insets of the accompanying video images from the Reports, which are provided so that the Court need not load the DVD into a player each time it wishes to assess the contents of the reports.[2]  The January and May Reports each were also posted to the CBS News website with accompanying articles the same evenings they were broadcast.  Compl. ¶¶ 45, 97; *id.* Exs. A-B.  There are no material differences between the Reports as broadcast and on the website.

### A.     The January Report

The January Report is introduced by the CBS Evening News anchor, defendant Scott Pelley, who tells viewers that the upcoming report stems from the investigatory work of Axelrod and Velie in West Virginia, "where the State is suing, accusing pharmacies and drug distributors of making millions pushing narcotics to anyone who wants them."  Ex. 2 at 2:5-9.  The Report then unfolds in three parts.  It begins with footage of patients lined up for prescriptions at the Sav-Rite Pharmacy (the signage for which is clearly visible) in Kermit, West Virginia, described as Kermit's "main pharmacy."  *Id.* at 2:10-16.  Axelrod then interviews attorney James Cagle, who "represents the State in the groundbreaking lawsuit against pill mills and wholesale drug distributors," regarding the scope of the problem, and Cagle states that Sav-Rite filled more prescriptions for oxycodone "than all but 21 pharmacies" in the country.  *Id.* at 2:17–3:1.  Axelrod next discusses James Wooley, who operated Sav-Right pharmacy until 2012, when he "lost his license and served six months in prison for illegally dispensing drugs."  *Id.* at 3:10-11.

---

[2] "Although as a general rule extrinsic evidence should not be considered at the 12(b)(6) stage, we have held that when a defendant attaches a document to its motion to dismiss, a court may consider it in determining whether to dismiss the complaint [if] it was integral to and explicitly relied on in the complaint and [if] the plaintiffs do not challenge its authenticity."  *Am. Chiropractic Ass'n, Inc. v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004) (internal marks omitted); *see also Cruse v. Frabrizio*, 2014 WL 3045412, at *7 (S.D. W. Va. July 2, 2014) (finding that challenged news broadcast was integral to plaintiff's defamation and related claims and considering copy tendered by defendant).

The Report notes that Wooley ordered millions of doses of hydrocodone and took in millions of dollars in profit.  *Id.* at 3:5-9.

The Report then turns to Tug Valley Pharmacy, which on first reference is identified as "now being sued for negligently filling prescriptions," and Axelrod adds that "[r]ecords show Tug Valley was filling more than 150 pain prescriptions a day from one clinic alone."  *Id.* at 3:12-16.  Ballengee acknowledges on camera that he has been "named in a lawsuit alleging substandard care," but otherwise declines to comment for the news report.  *Id.* at 3:19–4:5.

Finally, the Report turns to the drug "distributors" – *i.e.*, the pharmaceutical companies – that are the focus of "the unprecedented lawsuit" mentioned at the top of the Report.  *Id.* at 4:8-17.  Axelrod interviews Karen Bowling, the West Virginia Secretary of Health, regarding the distributors' role in the crisis, and then returns to Cagle, who confirms that "distributors are legally bound to report suspicious orders from pharmacies."  *Id.* at 4:8–5:3.  The report then mentions AmerisourceBergen, "the third largest drug wholesaler in the country and one of 11 defendants in the State's case," which "filled orders for 118 million hydrocodone and oxycodone pills" in a five-year period.  *Id.* at 5:4-9.  Axelrod notes that that figure is "enough to supply every West Virginian with 13 pain pills a year," and Cagle characterizes that fact as "the product of what [he] would refer to as a business plan, a business plan by people that are not honorable people."  *Id.* at 5:8-14.  Axelrod concludes by noting that the "potentially precedent-setting trial" against AmerisourceBergen was set to begin later that year.  *Id.* at 5:17-19.

## B.    Events Between The January And May Reports

On January 20, 2016, two weeks after the January Report was broadcast, Tug Valley Pharmacy filed an emergency petition in the Circuit Court for Kanawha County seeking a temporary restraining order and an injunction ordering McKesson Corporation "to continue to

provide on a wholesale basis controlled substances and other medical and pharmacological products to Tug Valley Pharmacy." *See* Ex. 8 at 1 (relevant pages of petition). Tug Valley stated in its verified petition that McKesson had supplied it with "controlled substances and other medical and pharmacological products" since September 2015, but had provided notice that "it would no longer sell or provide on a wholesale basis controlled substances to Tug Valley Pharmacy." *Id.* ¶¶ 3, 5. McKesson responded on January 25, 2016, stating in its brief that "[r]esuming shipments of controlled substances to Tug Valley Pharmacy risks having the DEA and/or the West Virginia Board of Pharmacy take regulatory action against McKesson." *See* Ex. 9 at 4 (relevant pages of response brief). As McKesson explained:

> [A] January 7, 2016 CBS News investigative report alerted McKesson that Tug Valley Pharmacy was a defendant in a lawsuit in Mingo County that alleged that Tug Valley Pharmacy contributed to the plaintiffs' addictions by dispensing high volumes of controlled substances. Per McKesson's controlled substances monitoring program, this media event prompted it to review Tug Valley Pharmacy. That review brought to McKesson's attention a brief in the Mingo County lawsuit against Tug Valley Pharmacy. McKesson learned from the brief that Tug Valley Pharmacy's owner, Samuel Ballengee, testified that he filled more than 150 prescriptions daily from one pain clinic alone and that a pharmacist testified that Tug Valley Pharmacy was improperly filling prescriptions for class 3 and 4 narcotics. Thus, McKesson's review provided McKesson with a good-faith belief that continued shipments to Tug Valley Pharmacy put McKesson in jeopardy of being noncompliant with federal and/or state laws and regulations concerning the distribution of controlled substances.

*Id.* at 6 (citations and internal marks omitted). Four days after McKesson filed its brief, Tug Valley Pharmacy voluntarily dismissed its suit against McKesson. *See* Ex. 10 (notice).

## C.     The May Report

Some four month later, CBS broadcast the May Report. Once again reported by Axelrod and produced by Velie, it focuses on wholesale distributors of prescription opioids. Axelrod first speaks with Joe Rannazzisi, formerly of the DEA, who explains that wholesale drug distributors

have a legal obligation to report suspicious orders of controlled substances by the pharmacies with which they do business. Ex. 3 at 2:17–3:5. The Report then notes that the DEA has brought multiple civil lawsuits for breach of that duty, including against the nation's largest drug distributor, McKesson, which paid tens of millions of dollars in related fines. *Id.* at 3:6-22. Axelrod explains that West Virginia has itself brought a lawsuit against McKesson, noting that "[r]ecords reveal in a five year period [McKesson] delivered nearly 100 million opiates to a state with 1.8 million people," and that McKesson is alleged to have "incentivize[d] sales with bonuses for the sale of oxycodone and hydrocodone." *Id.* at 4:7-14. The Report then re-introduces viewers to Tug Valley Pharmacy, explaining that it had been supplied by McKesson, and repeating from the January Report the fact that Ballengee was "facing several lawsuits for negligence," that he had admitted "to filling 150 pain pill prescriptions daily for one clinic alone," and that he would not comment on camera except to confirm that he was a defendant "in a lawsuit alleging substandard care." *Id.* at 4:15–5:7. Axelrod then goes on to report that McKesson had "terminated its contract with Tug Valley [Pharmacy]" after learning from the January Report about the civil lawsuits. *Id.* at 5:8-12. The May Report closes with an official statement by McKesson to the effect that it agrees "the substance abuse epidemic is a serious problem" and that it supports "prevention efforts." *Id.* at 5:18–6:1.

## III.     THE COMPLAINT IN THIS ACTION

Ballengee filed his 243-paragraph Complaint in this action on January 6, 2017. It does not appear useful to recount in detail here all of his allegations. Suffice to say that Ballengee alleges that sixteen statements in the January and May Reports communicated to viewers a set of three related, purportedly false and defamatory implications about him:

(1) that Ballengee had been criminally charged or was under investigation for violation of federal criminal law, Compl. ¶¶ 51-52, 57-58, 107-08;

7

(2) that Ballengee had otherwise acted unlawfully, *id.* ¶¶ 50, 53, 56, 104; and

(3) that Ballengee had otherwise improperly contributed to the opioid epidemic, *id.*
    ¶¶ 54-55, 101-03, 105.

Based on these allegedly false "implications," Ballengee purports to state claims for defamation

(Count I), false light invasion of privacy (Count II), tortious interference (Count III), and

intentional infliction of emotional distress (Count IV).  Ballengee seeks compensatory,

consequential and punitive damages, attorney's fees and costs, and injunctive relief including an

order that the Defendants "issue a retraction and/or apology" to him.  Compl. at 36-37.

Defendants timely moved to dismiss the Complaint pursuant to Rule 12(b)(6).

## ARGUMENT

A complaint is properly dismissed if it "fail[s] to state a claim upon which relief can be

granted."  Fed. R. Civ. P. 12(b)(6).  "To warrant the denial of a 12(b)(6) motion, the 'factual

allegations in the complaint must be enough to raise a right to relief above the speculative

level.'"  *Mayfield v. NASCAR, Inc.*, 674 F.3d 369, 377 (4th Cir. 2012) (quoting *Bell Atl. Corp. v.

Twombly*, 550 U.S. 544, 555 (2007) (alterations omitted)).  "Relief, in other words, must be

'plausible.'"  *Id.* (quoting *Twombly*, 550 U.S. at 556).  "[D]etermining whether a complaint states

a plausible claim is context-specific, requiring the reviewing court to draw on its experience and

common sense."  *Ashcroft v. Iqbal*, 556 U.S. 662, 663-64 (2009).  Here, it is apparent from the

face of the Reports at issue, and from judicial records and related documents of which the Court

may take judicial notice, that Ballengee cannot state a plausible claim for relief.

## I.   PLAINTIFF'S DEFAMATION CLAIM FAILS AS A MATTER OF LAW

"In West Virginia, the elements for a successful defamation action are '(1) defamatory

statements; (2) a nonprivileged communication to a third party; (3) falsity; (4) reference to the

plaintiff; (5) at least negligence on the part of the publisher; and (6) resulting injury.'"

*Cunningham Energy, LLC v. Outman*, 2013 WL 5274361, at *3 (S.D. W. Va. Sept. 18, 2013)

(Goodwin, J.) (quoting *Crump v. Beckley Newspapers, Inc.*, 320 S.E.2d 70, 77 (W. Va. 1983)).

Despite repeatedly referring in the Complaint to purportedly "false" statements made about him

in the two Reports, however, Ballengee does not identify even a single false statement about him

– let alone an unprivileged and defamatory statement of fact about him – in either broadcast.

Rather, Ballengee theorizes in Count I of his Complaint that a series of accurate statements about

the opioid epidemic would cause viewers to draw false and defamatory inferences about him.

Under the law of this circuit, however, his theory does not withstand even minimal scrutiny.

### A. The Only Statements In The Reports Actually About Ballengee Or His Pharmacy Are True And Privileged

As the Court can determine for itself, the two Reports actually contain only three

statements that can reasonably be understood as about Ballengee or Tug Valley Pharmacy.  First,

in both Reports, Axelrod informs viewers that Ballengee and the Pharmacy are named as

defendants in civil lawsuits alleging negligence and substandard care.  Ex. 2. at 3:12-14, 3:21-22;

Ex. 3 at 4:20-21, 5:2-3.  Ballengee himself is shown confirming the accuracy of that statement in

both Reports.  Ex. 2 at 4:1; Ex. 3 at 5:4.  Second, the Reports both inform viewers that Ballengee

admitted during the course of that litigation to filling 150 or more pain pill prescriptions per day

for one medical practice alone.  Ex. 2 at 3:14-16; Ex. 3 at 4:20–5:1.  Third, the May Report

informs viewers that McKesson terminated its contract with the Pharmacy after learning about

the Mingo County lawsuits from the January Report.  Ex. 3 at 5:8-12.

Ballengee concedes the truth of each of these statements.  Compl. ¶¶ 32, 63, 71.  And

even if he had not conceded their truth, they are demonstrably true and/or privileged, rendering it

impossible as a matter of law for him to state a claim based on the statements.  Specifically, this

Court is entitled even on a motion to dismiss to take judicial notice of relevant state court records. *Witthohn v. Fed. Ins. Co.*, 164 F. App'x 395, 397 (4th Cir. 2006). That Ballengee is a defendant in civil lawsuits alleging that he negligently contributed to patients' opioid addictions and rendered substandard care as a pharmacist is established by the pleadings on file in those lawsuits, which are described in the Supreme Court of Appeals' decision in *Tug Valley Pharmacy*, 773 S.E.2d 627. The record in those lawsuits, including Ballengee's own deposition testimony, likewise establishes his admission that he had "fill[ed] between 150 and 200 prescriptions per day from the [Mountain Medical Center] alone." *See* Ex. 7 at 47:3-7; Ex. 6 at *11.

Moreover, all three of the statements about Ballengee would be privileged. West Virginia recognizes a privilege to report on official proceedings, often called the fair report privilege, as set out in Restatement (Second) of Torts § 611. *See Cruse*, 2014 WL 3045412, at *8 (citing *Hinerman v. Daily Gazette Co.*, 423 S.E.2d 560, 578 (W. Va. 1992)). It is clear that filings in a judicial proceeding fall within the scope of that privilege. *See* Restatement (Second) of Torts § 611 cmt. e. And the statements actually about Ballengee and Tug Valley Pharmacy – (1) that they are defendants in civil lawsuits, (2) that Ballengee admitted to filling at least 150 prescriptions per day for one clinic, and (3) that McKesson ceased supplying the Pharmacy with prescription painkillers after the January Report – are "accurate and complete or a fair abridgement" of, respectively, (1) the ruling of the Supreme Court of Appeals, (2) the testimony of Ballengee cited in respondents' brief in that matter, and (3) the filings in the Pharmacy's litigation against McKesson. *See Hinerman*, 423 S.E.2d at 578 (had defamation defendant "simply published the allegations against [plaintiff] set forth in [the court filing], or a fair

abridgement of those allegations, then that publication, notwithstanding that it would have been damning, would also have been privileged.").

Ballengee evidently recognizes that he cannot state a claim based on these statements, because – like many subjects of unflattering news reports before him – he instead premises his defamation claim on implications he purports to find in the Reports.  The law, however, does not permit the kind of end-run that Ballengee attempts here.

### B.     Ballengee Cannot Plead Or Prove A Claim For Defamation-By-Implication For Two Reasons

As noted above, *supra* at 7-8, Ballengee alleges that sixteen statements in the Reports communicated to viewers three related implications – that he had: (1) been criminally charged or was under investigation for violation of federal criminal law; (2) otherwise acted unlawfully; and (3) otherwise improperly contributed to the opioid epidemic.

In *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087 (4th Cir. 1993), the Fourth Circuit set forth clear standards for district courts to apply when evaluating the viability of a claim for defamation by implication.  There, plaintiffs alleged that a newspaper report that "pointedly questioned the finances" of their charitable efforts conveyed a variety of implications, including that a statement to the effect that the program for sending holiday "'Gift Pacs' to American soldiers in Saudi Arabia" involved a "hefty mark-up" on the wholesale costs of the gifts implied that the operator was enriching himself.  *Id.* at 1091.  In other words, plaintiffs "primarily allege[d] the falsity of implications, rather than the facts literally related by the [challenged] article."  *Id.* at 1092.  The Court of Appeals held that, for such a claim to proceed, the

> defamatory implication must be present in the plain and natural meaning of the words used.  Moreover, because the constitution provides a sanctuary for truth, a libel-by-implication plaintiff must make an especially rigorous showing where the expressed facts are literally true.  The language must not only be reasonably read to impart the false

11

> innuendo, but it must also affirmatively suggest that the author intends
> or endorses the inference.

*Id.* at 1092-93 (citations and internal marks omitted).  Applying these twin standards, the Fourth

Circuit affirmed the district court's order dismissing the complaint.  *Id.* at 1098-99.

Here, it is evident from the face of the Reports that Ballengee cannot make out the

elements of his claim.  Viewing each Report as a whole and the few statements actually relating

to Ballengee in context as the Court must, *see Crump*, 320 S.E.2d at 87, neither Report can

reasonably be said to convey the implications alleged in Ballengee's Complaint.  With regard to

the purported implication that Ballengee was criminally charged, for example, the January

Report clearly differentiates between the *criminal* prosecution involving Sav-Rite pharmacy and

Wooley, *see* Ex. 2 at 2:10–3:11, and the *civil* actions against Tug Valley Pharmacy, which is

introduced as "being sued for negligently filling prescriptions," and Ballengee, who concedes on

camera that he has been "named in a lawsuit alleging substandard care," *see id.* at 3:12 – 4:5; *see*

*also* Ex. 4 at 3-4 (showing how Report visually distinguishes between discussion of Sav-Rite and

Tug Valley pharmacies).  The May Report does not mention any criminal charges whatsoever.

The implication of criminal wrongdoing alleged by Ballengee simply is not reasonably drawn

from the Reports.  *See Dodds v. ABC, Inc.*, 145 F.3d 1053, 1064-66 (9th Cir. 1998) (citing

*Chapin* favorably and rejecting defamation claim in part because "the implication cannot

reasonably be drawn that [plaintiff] was involved in any criminal activity" simply from

plaintiff's being included "in the same segment" as those "whose actual or alleged conduct was

criminal").

Likewise, with regard to the alleged implications that Ballengee otherwise acted

unlawfully or improperly, the January Report accurately observed that Tug Valley Pharmacy "is

*now* being sued" and the May Report stated that Ballengee "*is facing* several lawsuits."  Ex. 2 at

3:13; Ex. 3 at 4:20-21.  In other words, the Reports make clear that Ballengee and his Pharmacy are confronted with *pending* allegations of *tortious* conduct – not that those allegations have been proven (much less that the alleged conduct is criminal).  The contention that the Reports conveyed the implication that Ballengee had in fact been proven a wrong-doer simply is not a reasonable reading of the Reports.  *See Duncan v. Gilead Scis., Inc.*, 2011 WL 1807017, at *3 (S.D. W. Va. May 9, 2011) (finding that "the plain and natural meaning of the words [at issue] does not impart a defamatory implication"); *cf. Cruse*, 2014 WL 3045412, at *10 (while report discussed criminal allegations, it also made "clear that the matter was still under investigation").

Turning from the initial question of whether the Reports could reasonably convey the alleged implications in the first place to the second prong of the *Chapin* test, the Court is to consider whether the language used in the Reports "affirmatively suggest[s]" that CBS "intend[ed] or endorse[d]" any of those purported implications.  993 F.2d at 1092-93.[3]  Here, the opposite is true:  The Reports both visually and verbally distinguish between the civil litigation pending against Ballengee, the civil suits brought by the DEA and various states against wholesale drug distributors, and the criminal prosecution involving Sav-Rite pharmacy and Wooley.  For example, the statement that Ballengee is "facing several lawsuits," Ex. 3 at 4:20-21, does not evince any intention to suggest that the allegations against Ballengee have been resolved or have merit.  Similarly, the May Report states that McKesson "terminated its

_____

[3] *See also, e.g.*, *White v. Fraternal Order of Police*, 909 F.2d 512, 526 (D.C. Cir. 1990) (rejecting claim of defamation-by-implication because court could not find that "it would be reasonable for a reader to conclude that [defendant] intended the defamatory inference"); *Thomas v. Los Angeles Times Commc'ns, LLC*, 189 F. Supp. 2d 1005, 1013 (C.D. Cal. 2002) (finding no claim for defamation-by-implication because "no reasonable juror could find that Defendants intended to convey [the alleged] impression"), *aff'd*, 45 F. App'x 801 (9th Cir. 2002); *Cunningham Energy*, 2013 WL 5274361, at *3 (granting motion to dismiss defamation-by-implication claim because communication "does not affirmatively suggest that [defendant] intends or endorses the defamatory inference"); *Duncan*, 2011 WL 1807017, at *3 ("there is nothing in the [challenged] language which affirmatively suggests that Defendant intends or endorses" alleged implication).

contract" with the Pharmacy after it "learn[ed] about" the Mingo County litigation from the January Report, Ex. 3 at 5:8-12, but this statement evidences no intent on the part of CBS to imply, as Ballengee alleges, Compl. ¶ 105, that he and McKesson conspired to contribute to the opioid epidemic.

Truth is without question a "complete defense to an allegation of defamation." *Crump*, 320 S.E.2d at 79. And the lesson of *Chapin* is that plaintiffs cannot make an end-run around that bedrock constitutional principle by bringing defamation claims based on accurate but unflattering news reports, ginning up implications allegedly imparted by those reports, and then attacking those purported implications as false. Yet, that is precisely what Ballengee attempts here and, in accord with *Chapin*, his claim in Count I for defamation should be dismissed.

## II. PLAINTIFF'S FALSE LIGHT CLAIM FAILS AS A MATTER OF LAW FOR MULTIPLE REASONS

Ballengee's claim in Count II for false light invasion of privacy literally is duplicative of his defamation claim: It is based on precisely the same alleged implications in the Reports and nothing more. *See* Compl. ¶ 189. As a threshold matter, then, because Ballengee's defamation-by-implication claim fails for the reasons discussed above, his false light claim necessarily fails along with it. *See Crump*, 320 S.E.2d at 87 ("courts and commentators have consistently treated false light privacy claims in essentially the same manner as they have treated defamation.").

But there is another, independent reason why Ballengee's false light claim fails as a matter of law: Because the Reports concerned a matter of legitimate public interest to which Ballengee was logically linked, it is an element of his cause of action that Ballengee plead and prove that CBS had knowledge that it was communicating falsities about him or that CBS acted in reckless disregard of whether it was communicating falsities about him. *Crump*, 320 S.E.2d at 90 ("when public officials, public figures, or legitimate matters of public interest are involved,

14

plaintiffs may recover [for false light] only upon proof of knowledge of falsity or reckless

disregard for the truth"); *accord Taylor v. W. Virginia Dep't of Health & Human Res.*, 788

S.E.2d 295, 315-16 (W. Va. 2016); *Bell v. Nat'l Republican Cong. Comm.*, 187 F. Supp. 2d 605,

617 (S.D. W. Va. 2002) (Goodwin, J.).  That the Reports only mention Ballengee in the context

of a legitimate matter of public interest is not subject to reasonable dispute.  *Daily Gazette Co. v.

W. Virginia Bd. of Med.*, 352 S.E.2d 66, 69 n.5 (W. Va. 1986) ("the operation of the judicial

system" is "a matter of public interest, necessarily engaging the attention of the news media")

(quoting *Landmark Commc'ns, Inc. v. Virginia*, 435 U.S. 829, 839 (1978)); *accord Doe 2 v.

Associated Press*, 331 F.3d 417, 421-22 (4th Cir. 2003); *see also Brown v. CVS Pharmacy, LLC*,

982 F. Supp. 2d 793, 810 (M.D. Tenn. 2013) ("prescription practices by a pain management

clinic, including prescriptions for opioids specifically, [are] a legitimate public concern").

Simply put, Ballengee has not and cannot adequately allege knowing or reckless falsity.

Following the Supreme Court's decisions in *Iqbal* and *Twombly*, federal courts have made it

clear that conclusory allegations are insufficient to adequately plead knowledge of falsity or

reckless disregard for the truth, and thereby to survive a motion to dismiss.  *Mayfield*, 674 F.3d

at 377 (rejecting in defamation context argument that such allegations "need only be articulated

in the most general terms"); *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016)

(same, and observing that "every circuit that has considered the matter" has held that such suits

may be dismissed where plaintiff has not pled facts "sufficient to give rise to a reasonable

inference of" knowledge of or recklessness as to falsity); *accord Schatz v. Republican State

Leadership Comm.*, 669 F.3d 50, 56 (1st Cir. 2012); *Biro v. Conde Nast*, 807 F.3d 541, 544-45

(2d Cir. 2015); *Pippen v. NBCUniversal Media, LLC*, 734 F.3d 610, 614 (7th Cir. 2013).

15

Instead, a plaintiff must plead enough facts "to raise" the existence of knowledge of falsity or reckless disregard for the truth "above the speculative level." *Mayfield*, 674 F.3d at 377.

With a single exception, Ballengee's repeated, bald allegations that CBS "knew or should have known" that various purported facts or implications were false, Compl. ¶¶ 134-35, 142-54, represent precisely the kind of conclusory assertion of the legal standard, unsupported by any factual allegations that might give plausibility to the assertion, that the courts have rejected.  In fairness, Ballengee makes one allegation that bears further scrutiny:  He asserts that attorney James Cagle, who was interviewed in the January Broadcast, is "at least professionally biased" against him.  *See* Compl. ¶¶ 137-41.  But even assuming for the purposes of this motion the truth of Ballengee's factual allegation of bias on the part of this news source, the allegation is of no help to Ballengee because it is legally irrelevant to pleading the existence of knowledge of falsity or recklessness as to it.  As the Fourth Circuit has explained, "Self-interest (and the related desire to place opposing views and persons in an unfavorable light) motivates many news sources; if dealing with such persons were to constitute evidence of actual malice on the part of a reporter, much newsgathering would be severely chilled."  *Reuber v. Food Chem. News, Inc.*, 925 F.2d 703, 715 (4th Cir. 1991); *see also, e.g.*, *Spacecon Specialty Contractors, LLC v. Bensinger*, 713 F.3d 1028, 1045 (10th Cir. 2013) (even where publisher knew that its source "was involved in a dispute with [plaintiff] and may have been biased," that does not mean the publisher had "obvious reasons to doubt [the source's] veracity or the accuracy of his report").

Thus, even were the Court to conclude that reasonable viewers of the Reports in full and in context could conclude that they communicate the allegedly false and defamatory implications identified by Ballengee *and* that the language of the Reports itself demonstrates that CBS intended or endorsed those implications, the false light claim would still fail as a matter of law

16

because Ballengee has not adequately pleaded knowledge of or recklessness as to falsity, an element of his cause of action.

## III.    PLAINTIFF FAILS TO STATE A CLAIM FOR TORTIOUS INTERFERENCE

"[T]o make out a claim for tortious interference with business relationships, plaintiff must show: (1) existence of a contractual or business relationship or expectancy; (2) an intentional act of improper interference by a party outside that relationship or expectancy; (3) proof that the interference caused the harm sustained; and (4) damages." *Smith v. Teach*, 2009 WL 1974304, at *2 (N.D. W. Va. July 7, 2009) (citing *Hatfield v. Health Mgmt. Assocs. of W. Virginia, Inc.*, 672 S.E.2d 395, 403 (W. Va. 2008)).  Ballengee alleges in Count III that CBS, by broadcasting the two Reports, interfered with two specific business relationships: a contract with his ex-wife and a contract with McKesson to supply painkillers to Tug Valley Pharmacy. *See* Compl. ¶¶ 210, 213-14.  He also vaguely alleges interference with "business, contractual relationships, expectancies, and/or opportunities" with various pharmacies and other drug distributors.  *See id.* ¶¶ 211-12, 219.

But Ballengee cannot make out a tortious interference claim as to any of these alleged contracts or expectancies, for at least two reasons.  First, in West Virginia "truthful information is an absolute bar to a claim of tortious interference 'whether or not the information is requested.'" *Smith*, 2009 WL 1974304, at *2 (quoting *Tiernan v. Charleston Area Med. Ctr., Inc.*, 506 S.E.2d 578, 593 (W. Va. 1998)).  As demonstrated above, all of the statements about Ballengee in the two Reports were true.  Consequently, even if the Reports did cause third parties to breach their contracts or expectancies, the Reports cannot form the basis of a tortious interference claim as a matter of law.  *See* Restatement (Second) of Torts § 772(a) & cmt. b ("There is of course no liability for interference with a contract or with a prospective contractual

17

relation on the part of one who merely gives truthful information to another.  The interference in this instance is clearly not improper. . . . It is also true whether or not the information is requested."); *Tiernan*, 506 S.E.2d at 593 ("[W]e now adopt [Section 772] of the Restatement in its entirety.").

Second, CBS cannot be liable for tortious interference with any of Ballengee's contracts or expectancies because Ballengee does not and cannot allege that CBS had any knowledge of those contracts at the time of broadcast.  "To be subject to liability [for tortious interference], the [defendant] must have knowledge of the contract with which he is interfering and of the fact that he is interfering with the performance of the contract.  Although the [defendant]'s conduct is in fact the cause of another's failure to perform a contract, the [defendant] does not induce or otherwise intentionally cause that failure if he has no knowledge of the contract."  Restatement (Second) of Torts § 766 cmt. i.  Indeed, in *Ferrell v. Rose*, No. 101557 (W. Va. May 27, 2011) (memorandum decision), at 3,[4] the Supreme Court of Appeals squarely rejected a litigant's proposal that it eliminate the "specific intent" element of this tort.  Because Ballengee does not even attempt to plausibly allege that CBS knew about *any* of the contracts or expectancies with which it ostensibly interfered, this claim fails for this additional reason as well.[5]

---

[4] http://www.courtswv.gov/supreme-court/memo-decisions/spring2011/101557Memo.pdf

[5] Additionally, many courts also have questioned whether tortious interference claims "could *ever* be stretched to cover a case involving news gathering and publication."  *Seminole Tribe of Florida v. Times Publ'g Co.*, 780 So. 2d 310, 318 (Fla. 4th DCA 2001) (emphasis added); *see also, e.g.*, *Brown & Williamson Tobacco Corp. v. Jacobson*, 713 F.2d 262, 273-74 (7th Cir. 1983) ("[T]his approach would make every case of defamation of a corporation actionable as wrongful interference, thereby enabling the plaintiff to avoid the specific limitations with which the law of defamation – presumably to some purpose – is hedged about."); *Huggins v. Povitch*, 1996 WL 515498, at *9 (N.Y. Sup. Ct. Apr. 19, 1996) ("broadcaster whose motive and conduct is intended to foster public awareness or debate cannot be found to have engaged in the wrongful or improper conduct required" to support cause of action).  CBS submits that this is a further reason why Count III fails as a matter of law.

## IV.   PLAINTIFF'S EMOTIONAL DISTRESS CLAIM ALSO FAILS AS A MATTER OF LAW

"[F]or a plaintiff to prevail on a claim for intentional or reckless infliction of emotional distress ["IIED"], . . . [i]t must be shown: (1) that the defendant's conduct was atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency; (2) that the defendant acted with the intent to inflict emotional distress, or acted recklessly when it was certain or substantially certain emotional distress would result from his conduct; (3) that the actions of the defendant caused the plaintiff to suffer emotional distress; and, (4) that the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it." *Carper v. Clay Cty. Bd. of Health*, 2015 WL 4163277, at *8 (S.D. W. Va. July 9, 2015) (Goodwin, J.) (quoting *Travis v. Alcon Labs., Inc.*, 504 S.E.2d 419, 425 (W. Va. 1998)), *aff'd*, 648 F. App'x 368 (4th Cir. 2016).  Ballengee premises his claim in Count IV for IIED exclusively on the broadcast by CBS of the two Reports at issue.  The Fourth Circuit, however, has squarely held that, where a plaintiff seeks through an IIED claim to recover damages based on the same speech that he alleges to be defamatory, the IIED claim cannot survive where the defamation claim fails.  *Hatfill v. N.Y. Times Co.*, 532 F.3d 312, 325 (4th Cir. 2008) (rejecting IIED claim where plaintiff could not show actual malice required to support defamation claim); *see also Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 56 (1988) (plaintiffs cannot avoid constitutional limitations on defamation claims merely by pleading IIED instead); *Cruse*, 2014 WL 3045412, at *12 (noting that "to allow [plaintiff] to circumvent the protections of the fair report privilege simply by alleging intentional infliction of emotional distress would defeat the purpose of the privilege").  Here, Ballengee's defamation claim fails for the reasons noted above, including that the statements about Ballengee are true and privileged, that the implications alleged by Ballengee are not reasonably conveyed by the Reports, and that the

Reports themselves never suggest that CBS intended or endorsed those alleged implications. Ballengee's tag-along IIED claim should therefore be dismissed for the same reasons that his other claims are properly rejected.

## V.     PLAINTIFF FAILS TO STATE ANY CLAIM AS TO SCOTT PELLEY

The Complaint is deficient as to Pelley for the additional reason that the news anchor is not alleged to have said anything about Ballengee, much less anything false and defamatory.  As Pelley introduces the January Report (his *only* statement other than to thank Axelrod at the end), he observes that West Virginia is "suing, accusing pharmacies and drug distributors of making millions pushing narcotics to anyone who wants them."  Ex. 2 at 2:1-9.  Pelley's statement does not in any way refer to Ballengee, and in any event is literally true.  *Liberty Mut. Fire Ins. Co. v. JM Smith Corp.*, 602 F. App'x 115, 117 (4th Cir. 2015) (State alleged "drug distributors were contributing to a well-publicized prescription drug abuse epidemic in West Virginia by failing to identify, block, and report excessive drug orders" and "identified 'pill mills' – physicians, pharmacists, and distributors of controlled substances who write and fill excessive prescriptions – as responsible for increased abuses").  Because Pelley is not alleged himself to have said anything false or defamatory about Ballengee, he should be dismissed for this further reason.

## CONCLUSION

For the foregoing reasons, all of the defendants respectfully request that this Court grant their motion and dismiss the Complaint.

Dated:  March 13, 2017                              Respectfully submitted,

                                                    CBS BROADCASTING INC.,
                                                    CBS NEWS INC., JIM AXELROD,
                                                    ASHLEY VELIE, and SCOTT PELLEY.

BY COUNSEL:                                           /s/   Thomas V. Flaherty
                                                    Thomas V. Flaherty (WVSB #1213)

20

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this 13th day of March 2017, I caused a true and correct copy of the foregoing Memorandum of Law in Support of Defendants' Motion to Dismiss to be served electronically via the Court's ECF system upon counsel for the plaintiff as follows:

> James D. McQueen, Jr.
> Anthony E. Nortz
> McQueen Davis, PLLC
> Century Bldg., Suite 200
> 314 Ninth Street
> Huntington, WV 25701
>
> Christopher J. Heavens
> Heavens Law Firm, PLLC
> 2438 Kanawha Blvd. East
> P.O. Box 3711
> Charleston, WV 25337-3711
>
> *Attorneys for Plaintiff*

                                        /s/  Thomas V. Flaherty
                                        Thomas V. Flaherty (WV Bar #1213)

Flaherty Sensabaugh Bonasso PLLC
P. O. Box 3843
Charleston, WV  25338-3843