IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

SAMUEL R. BALLENGEE,

           Plaintiff,

v.                             CIVIL ACTION NO.   2:17-cv-00212

CBS BROADCASTING, INC., et al.,

           Defendants.

MEMORANDUM OPINION AND ORDER

## I.    Introduction

In 2007, the plaintiff, Samuel Ballengee, opened Tug Valley Pharmacy ("Tug Valley") in Williamson, West Virginia, within two blocks of two notorious pill mills that were eventually shut down by government agencies. Customers formed lines outside of these pill mills daily before they opened. Tug Valley filled eye-popping quantities of pain prescriptions written by reckless doctors at these pill mills. In 2009, Tug Valley filled 42,115 hydrocodone prescriptions in a town with a population of only 3090. This was more than enough to give every man, woman, and child in Williamson a hydrocodone prescription every month of the year.

From 2010 to 2012, several of Mr. Ballengee's customers sued him and Tug Valley for negligently and/or recklessly filling prescriptions and for contributing to the customers' drug addictions. At least one of these customers died of an overdose

from prescription opioids. Several customers alleged that they saw drug deals occur right outside of Tug Valley. Customers also alleged that Mr. Ballengee would fill opioid prescriptions before their refill date, particularly if they paid in cash. The State of West Virginia has described Tug Valley as one of "the most notorious of the pill mill pharmacies in Southern West Virginia." Defs.' Mot. Summ. J. ("Defs.' Mot.") Ex. 41, at 32 [ECF No. 169-41].

CBS found this information newsworthy. After extensively investigating the opioid epidemic in West Virginia, CBS showcased Tug Valley during two broadcasts in 2016. Although the government has apparently decided not to take action against Mr. Ballengee, despite the egregious facts that follow, he nonetheless filed this defamation action against CBS. Mr. Ballengee alleges that the CBS broadcasts were defamatory, placed him in a false light, tortiously interfered with various contracts, and amounted to intentional infliction of emotional distress. The court must now decide whether these claims can survive summary judgment. For the reasons stated herein, the court concludes that they cannot.

## II.    Factual and Procedural Background

From 2007 to 2014, Mr. Ballengee owned and operated Tug Valley in Williamson, West Virginia. Compl. ¶¶ 29, 92. When Mr. Ballengee opened Tug Valley, he was aware that Mountain Medical Care Center ("Mountain Medical") and Dr. Diane Shafer's office were located within one block of the pharmacy. Defs.' Mot. Ex. 3, at 5–6 [ECF No. 169-3]. Both of these offices were notorious pill mills.

Tug Valley filled large quantities of controlled substance prescriptions, many of which were pain prescriptions,[1] in a town with a population of 3090. Defs.' Mot. Ex. 6 [ECF No. 169-6]. Many of these prescriptions came from Mountain Medical and Dr. Shafer's office. *Id.* In 2008, Tug Valley filled 10,195 controlled substance prescriptions written by Dr. Shafer and 11,111 controlled substance prescriptions written by doctors at Mountain Medical. *Id.* In 2009, Tug Valley filled 17,055 prescriptions for controlled substances written by Dr. Shafer and 29,027 prescriptions for controlled substances written by doctors at Mountain Medical. *Id.* In 2009, Tug Valley filled 42,115 hydrocodone prescriptions. This averages to 162 prescriptions per business day, 74 of which were from Mountain Medical. *Id.* On seven occasions from 2008 to 2009, Tug Valley filled more than 150 prescriptions for pain medication from Mountain Medical in a single day.[2]

On December 4, 2009, police executed a search warrant at Dr. Shafer's office because she was under investigation for improperly distributing controlled

---

[1] For purposes of this opinion, pain prescriptions include hydrocodone, oxycodone, Endocet, Vicodin, Lorcet, and Lortab.

[2] On January 2, 2008, Tug Valley filled 188 prescriptions for hydrocodone written by two employees of Mountain Medical. Defs.' Mot. Ex. 6-3, at 1–4. On March 10, 2008, Tug Valley filled 157 prescriptions for hydrocodone, 1 prescription for Endocet, 1 prescription for oxycodone, and 1 prescription for Vicodin, all written by a single employee of Mountain Medical. Defs.' Mot. Ex. 7, at 2 [ECF No. 169-7]. On May 5, 2008, Tug Valley filled 177 prescriptions for hydrocodone and 1 prescription for Endocet written by a single employee of Mountain Medical. *Id.* at 1. On May 1, 2009, Tug Valley filled 163 prescriptions for hydrocodone and 2 prescriptions for Lorcet written by two employees of Mountain Medical. Defs.' Mot. Ex. 6-3, at 5–7. On October 30, 2009, Tug Valley filled 151 prescriptions for hydrocodone and 2 prescriptions for Lortab written by three employees of Mountain Medical. *Id.* at 8–10. On December 1, 2009, Tug Valley filled 156 prescriptions for hydrocodone and 1 prescription for Lorcet written by two employees of Mountain Medical. *Id.* at 11–13. Finally, on December 31, 2009, Tug Valley filled 210 prescriptions for hydrocodone and 1 prescription for Lortab written by two employees of Mountain Medical. *Id.* at 14–17.

substances. Defs.' Mot. Ex. 11, at 1–2 [ECF No. 169-11]. On December 18, 2009, she surrendered her license to practice medicine. *Id.* Dr. Shafer ultimately pleaded guilty to conspiring to misuse a Drug Enforcement Administration registration number and was sentenced to six months in federal prison. Defs.' Mot. Ex. 22, at 3 [ECF No. 169-22]. In March 2010, the FBI raided Mountain Medical and closed the clinic for improperly prescribing controlled substances in violation of federal and state law. Defs.' Mot. Ex. 2, at 6 [ECF No. 169-2]; *Tug Valley Pharmacy, LLC v. All Plaintiffs Below in Mingo Cty.*, 773 S.E.2d 627, 629 (W. Va. 2015).

From 2010 to 2012, Mr. Ballengee and Tug Valley were named in four lawsuits filed by Tug Valley customers. Compl. ¶ 32. The lawsuits alleged that Mr. Ballengee and Tug Valley negligently and/or recklessly filled prescriptions for controlled substances and contributed to the customers' addictions. Defs.' Mot. Ex. 13, at 5 [ECF No. 169-13]; Defs.' Mot. Ex. 14, at 2–7 [ECF No. 169-14]. One of the lawsuits was brought on behalf of a Tug Valley customer who died of an overdose after consuming alprazolam and hydrocodone. Defs.' Mot. Ex. 10, at 6 [ECF No. 169-10]; Defs.' Mot. Ex. 14, at 2–8.

Sula Collins, who had prescriptions filled at Tug Valley for approximately four years, was one of the plaintiffs who sued Mr. Ballengee. Defs.' Mot. Ex. 15, at 3 [ECF No. 169-15]. She described her experience at Tug Valley as such:

> So I would go in and I would wait for so long. And there were so many people. I mean, there was such a line. And there were people coming in from everywhere. I mean, I noticed and I heard there were people coming from like

Ohio. There were people coming in from like way over in West Virginia. I can't remember the name of it. And there were people slumped over. I mean, totally out of their mind. I know when I seen them, somebody like that, I know . . . . And they were just like selling drugs outside the place . . . . I kept hearing people, you know, stating where they can get this and that and how much for.

Defs.' Mot. Ex. 18, at 12 [ECF No. 169-18]. Another customer testified that he also saw drug deals occur right outside of Tug Valley and that Tug Valley would fill narcotic prescriptions before their refill date, particularly if the customer paid in cash. *Id.* at 13.

On January 13, 2011, in relation to one of the civil lawsuits, Mr. Ballengee was deposed regarding his relationship with Mountain Medical. Defs.' Mot. Ex. 2, at 5–8. The following exchange took place during the deposition:

Q: Okay. What would be in the ballpark when Dr. Hoover and the Mountain Medical Care Center, LLC, were in their prime, so-to-speak, how many prescriptions would you say you fill in a day from there?

A: It would be an estimate, maybe 150 to 200.

. . . .

Q: Those would be if not 100 percent controlled substances, certainly a large part of that 150 would be for controlled substances, wouldn't it?

A: Most of their patients got more than just pain medication and nerve medication.

Q: I understand, but virtually, everyone of them got some pain medication, didn't they?

A: Most of them did.

5

*Id.* During the same deposition, Mr. Ballengee was also questioned regarding patients lining up outside of Mountain Medical:

> Q: Were you aware that people would stand on the street to get into that place, lining up before they even opened in the morning?
>
> A: Are you talking about Mountain Medical?
>
> Q: Yes, sir.
>
> A: I had heard that they would be in the building or outside smoking, I don't know if the line went out the door or anything, but I usually didn't drive down that way. When I come in I just come through the first row to get straight to the store.
>
> Q: And nobody who worked in your pharmacy indicated to you that they had people that are lining up in the darn snow, for example, to get into that building long before they are open, and it continues like that on a daily basis? Nobody said anything of that ilk to you?
>
> A: As we would establish business with them, yeah. But I don't know how long it takes to get into the building or anything like that so . . . .

*Id.* at 6–7.

In 2012, the State of West Virginia sued eleven pharmaceutical drug distributors that it alleges contributed to the prescription drug abuse problem in West Virginia. Defs.' Mot. Ex. 41, at 4 [ECF No. 169-41]. While the State did not name any pharmacies as defendants in the lawsuit, it discussed several pharmacies' practices in its second amended complaint. *Id.* at 1. The State described Tug Valley's role in the lawsuit in regard to AmerisourceBergen as such:

Amerisourcebergen was a distributor of substantial quantities of controlled substances to Tug Valley Pharmacy in Williamson, West Virginia. This pill mill pharmacy was located within yards of two notorious pill mill physicians and their operations in the town of Williamson. Doctors . . . operated pill mill clinics whose voluminous illegal prescriptions written for non-medical purposes were filled daily by this pharmacy to which Amerisourcebergen was distributing. . . . [T]hey distributed to Tug Valley Pharmacy a total of 149,300 hydrocodone (generic of Lorcet, Lortab, Vicodin, Vicoprofen, among others) tablets during the calendar year 2009 for an average supply of 12,441 tablets per month.

*Id.* at 16. The State also describes Tug Valley's role in the lawsuit in regard to H.D. Smith Wholesale Drug Co.:

[H.D. Smith] made substantial distributions to West Virginia pharmacies of controlled substances widely known to be among those substances which were abused, including . . . Tug Valley Pharmacy. . . . These pharmacies were among the most notorious of the pill mill pharmacies in Southern West Virginia.

. . . .

[H.D. Smith's] distributions to Tug Valley were suspiciously high when standing alone and more so when considered together with the distributions to Hurley [Drug Co., a pharmacy located only four blocks away from Tug Valley in Williamson]. For example, according to [H.D. Smith's] records, on October 18, 2007, H.D. Smith distributed 30,000 hydrocodone . . . tablets to Tug Valley Pharmacy. On October 16, 2007, H.D. Smith delivered 5000 hydrocodone . . . to Hurley drug. Then on October 18, 2007, H.D. Smith delivered another 4000 hydrocodone . . . to Hurley resulting in a total 39,000 hydrocodone delivered within a two (2) day period to a four (4) block area in a town which had a population of 3090 people.

The volume of oxycodone and hydrocodone pills distributed to Tug Valley Pharmacy by H.D. Smith in view of the

town's population, the close proximity to pill-pushing physicians whose reputations were both well-known and the subject of extensive publicity, the close proximity to another pharmacy, existence of other suppliers of controlled substances to this same pharmacy, all should have served to alert a distributor acting with due diligence that the orders were suspicious in nature.

*Id.* at 32–38.

On January 7, 2016, CBS aired a broadcast[3] that discussed the State of West Virginia's problems with opioid pain prescriptions. Defs.' Mot. Ex. 34 ("Jan. Tr.") [ECF No. 169-34]. The transcript of the entire report reads as follows:

MR. SCOTT PELLEY: Last night we showed you remarkable pictures of people lining up down the block to collect painkillers at a doctor's office, an office the authorities say is really just a front for drug dealing. Well, tonight Jim Axelrod and producer Ashley Velie continue their investigation in West Virginia where the State is suing, accusing pharmacies and drug distributors of making millions pushing narcotics to anyone who wants them.

MR. JIM AXELROD: No state has had more trouble with prescription pains [sic] pills than West Virginia and no town in West Virginia more trouble than Kermit, population 400. This undercover video of Kermit's main pharmacy shows scores of people picking up prescriptions inside and at the drive-through window.

MR. JIM CAGLE: They filled more scripts for oxycodone than all but 21 pharmacies in America.

MR. JIM AXELROD: In the country?

MR. JIM CAGLE: Yes, in the country.

---

[3] Jim Axelrod & Ashley Velie, *Drug Distributors Under Fire in West Virginia Painkiller Epidemic*, CBS Evening News (Jan. 7, 2016, 6:57 PM), https://www.cbsnews.com/news/drug-distributors-under-fire-in-west-virginia-painkiller-epidemic/.

MR. JIM AXELROD: Jim Cagle represents the State in the groundbreaking lawsuit against pill mills and wholesale drug distributors.

MR. JIM CAGLE: What you have is some bad doctors and pharmacies who are willing to turn a blind eye because of the money that's involved.

MR. JIM AXELROD: More than three million doses of hydrocodone were ordered by a Kermit pharmacist, James Wooley. In one year he paid drug distributers [sic] hundreds of thousands of dollars while netting more than six million dollars in profit.

In 2012, Wooley lost his license and served six months in prison for illegally dispensing drugs. But Cagle told us the problem persists. This pharmacy, Tug Valley, is now being sued for negligently filling prescriptions. Records show Tug Valley was filling more than 150 pain prescriptions a day from one clinic alone.

Hi. Are you Mr. Ballengee? I'm Jim Axelrod with CBS News.

We decided to ask owner Randy [4] Ballengee about the charges.

So you're named in a lawsuit alleging substandard care.

MR. RANDY BALLENGEE: Right.

MR. JIM AXELROD: You have nothing to say to me directly?

At his lawyer's direction, he wouldn't respond.

MS. KAREN BOWLING: We would think that an alarm bell would go off.

---

[4] The broadcast and corresponding transcript refer to Mr. Ballengee by his middle name, Randy.

MR. JIM AXELROD: West Virginia's Secretary of Health, Karen Bowling, says until now the drug distributers [sic] have escaped scrutiny.

MS. KAREN BOWLING: If you are a distributor, if you are, you know, providing medication, you know, to pharmacies, that someone but, would say, you know, wow, this is a lot. You know, what do we need to do about it?

MR. JIM AXELROD: That's the premise behind the unprecedented lawsuit. Under West Virginia's law, distributors are legally bound to report suspicious orders from pharmacies.

MR. JIM CAGLE: If that distributor has good reason to believe that the prescriptions that are being filled are not for legitimate medical purposes, then they are not to make that delivery.

MR. JIM AXELROD: They have an obligation?

MR. JIM CAGLE: They have a duty, yes.

MR. JIM AXELROD: AmerisourceBergen is the third largest drug wholesaler in the country and one of 11 defendants in the State's case. Over a five year period they filled orders for 118 million hydrocodone and oxycodone pills, enough to supply every West Virginian with 13 pain pills a year. That's scary math.

MR. JIM CAGLE: It is. Yes, it is. It is actually the product of what I would refer to as a business plan, a business plan by people that are not honorable people.

MR. JIM AXELROD: We reached out to lawyers for AmerisourceBergen. They told us they couldn't comment because of this ongoing litigation. This potentially precedent-setting trial is set to begin in October.

MR. SCOTT PELLEY: Remarkable reporting, Jim. Thanks.

*Id.* at 3–6.

Following the broadcast, one of Tug Valley's suppliers, McKesson, terminated its supply agreement with the pharmacy. Pl.'s Resp. Opp'n to Defs.' Mot. Summ. J. 5 ("Pl.'s Resp.") [ECF No. 183]. In an affidavit of Gary Boggs, Senior Director of Regulatory Affairs at McKesson, Mr. Boggs states that the January broadcast "alerted [him] that Tug Valley Pharmacy was a defendant in a lawsuit in Mingo County that alleged that Tug Valley Pharmacy contributed to the plaintiffs' addictions by dispensing high volumes of controlled substances." Defs.' Mot. Ex. 35 ("Boggs Aff."), ¶ 12 [ECF No. 169-35]. This "prompted [Mr. Boggs] to initiate a review of Tug Valley Pharmacy." *Id.* ¶ 13. As part of this review, Mr. Boggs read the plaintiffs' brief in the customers' lawsuit against Tug Valley. *Id.* ¶ 14. From reading the brief, Mr. Boggs learned that "Tug Valley Pharmacy's owner, Samuel Ballengee, testified that he filled more than 150 prescriptions daily from one pain clinic alone." *Id.* "Based upon the totality of the facts and circumstances, [Mr. Boggs] determined that McKesson had a good-faith belief that continued shipments to Tug Valley Pharmacy put McKesson 'in jeopardy of being noncompliant' with federal and/or state laws and regulations concerning the distribution of controlled substances." *Id.* ¶ 16. Thus, "[o]n January 8, 2016, McKesson determined to immediately terminate shipments of controlled substances to Tug Valley Pharmacy and notified Mr. Ballengee of the determination." *Id.* ¶ 17.

Thereafter, McKesson refused to supply Tug Valley with controlled substances until Mr. Ballengee no longer owned nor worked for the pharmacy. Pl.'s Resp. 5. Mr.

Ballengee was unable to find a distributor to sell him controlled substance prescriptions. Compl. ¶ 82. In March 2016, Mr. Ballengee was rapidly losing customers and sold Tug Valley. *Id.* ¶ 92. He then attempted to obtain employment as a pharmacist for Wal-Mart, where he had worked for fifteen years prior to opening Tug Valley, but was unable to do so. Pl.'s Resp. 36. After selling Tug Valley, Mr. Ballengee breached a contract with his ex-wife concerning alimony and child support and was forced to renegotiate the terms of that contract. Compl. ¶ 214.

On May 25, 2016, CBS aired a second broadcast[5] that mentioned Tug Valley. Defs.' Mot. Ex. 42 ("May Tr.") [ECF No. 169-42]. The relevant portion of that transcript reads as follows:

> MR. JIM AXELROD: Now in a potentially precedent-setting suit, West Virginia is suing McKesson. Records reveal in a five year period the wholesaler delivered nearly 100 million opiates to a state with 1.8 million people. The suit alleges that while West Virginia was drowning in painkillers, McKesson continued to incentivize sales with bonuses for the sale of oxycodone and hydrocodone.
>
> Last winter we traveled to this small Appalachian town where we found Tug Valley Pharmacy, which until January was supplied by McKesson.
>
> Hi. Are you Mr. Ballengee? I'm Jim Axelrod with CBS News.
>
> We discovered that pharmacist Randy Ballengee is facing several lawsuits for negligence, admitting to filling 150 pain pill prescriptions daily for one clinic alone.

---

[5] Jim Axelrod & Ashley Velie, *DEA Targets Drug Wholesalers to Stem Opioid Epidemic*, CBS Evening News (May 25, 2016, 7:06 PM), https://www.cbsnews.com/news/drug-distributor-mckesson-faces-lawsuit-in-effort-to-stem-opioid-painkiller-epidemic/.

You're named in a lawsuit alleging substandard care.

MR. RANDY BALLENGEE: Right.

MR. JIM AXELROD: You have nothing to say to me
directly?

MR. RANDY BALLENGEE: No.

MR. JIM AXELROD: McKesson terminated its contract
with Tug Valley, but only after learning about the charges
from our CBS News investigation, raising the question:
why hadn't the company discovered that on its own?

*Id.* at 4–5.

On January 6, 2017, Mr. Ballengee filed this lawsuit against CBS Corporation,
CBS Broadcasting, Inc., CBS News, Inc., Jim Axelrod, Ashley Velie, and Scott Pelley.
Compl. 1. The Complaint contains four counts: (1) defamation, (2) false light invasion
of privacy, (3) tortious interference, and (4) intentional infliction of emotional
distress. *Id.* ¶¶ 175–243. On June 18, 2018, the defendants[6] moved for summary
judgment on all counts. Defs.' Mot. [ECF No. 169]. The plaintiff filed a Response [ECF
No. 183], and the defendants filed a Reply [ECF No. 191]. The plaintiff also filed a
Supplementation to the Record [ECF No. 214]. The matter is ripe for adjudication.

III. **Legal Standards**

a. **Summary Judgment**

To obtain summary judgment, the moving party must show that there is no
genuine dispute as to any material fact and that the moving party is entitled to

---

[6] All of the defendants joined the motion except for CBS Corporation, which was previously dismissed
by stipulation.

13

judgment as a matter of law. Fed. R. Civ. P. 56(a). "Facts are 'material' when they might affect the outcome of the case." *News & Observer Publ'g. Co. v. Raleigh-Durham Airport Auth.,* 597 F.3d 570, 576 (4th Cir. 2010). "A genuine issue of material fact exists if . . . a reasonable fact-finder could return a verdict for the non-movant." *Runyon v. Hannah*, No. 2:12-1394, 2013 WL 2151235, at *2 (S.D. W. Va. May 16, 2013) (citations omitted); *Williams v. Griffin*, 952 F.2d 820, 824 (4th Cir. 1991) ("Disposition by summary judgment is appropriate . . . where the record as a whole could not lead a rational trier of fact to find for the non-movant."). The moving party bears the burden of showing that "there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

In considering a motion for summary judgment, the court will not "weigh the evidence and determine the truth of the matter." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Instead, the court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986). Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp.*, 477 U.S. at 322–23. The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or unsupported speculation, without more, are

insufficient to preclude the granting of summary judgment. *See Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013); *Stone v. Liberty Mut. Ins. Co.*, 105 F.3d 188, 191 (4th Cir. 1997).

### b. Choice of Law

This case is a diversity jurisdiction action brought under West Virginia law. Compl. 1–5. When exercising diversity jurisdiction, a district court applies the choice-of-law rules of the state in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Wells v. Liddy*, 186 F.3d 505, 521 (4th Cir. 1999). In tort cases in West Virginia, the applicable substantive law is the law of the place of injury. *McKinney v. Fairchild Int'l, Inc.*, 487 S.E.2d 913, 922 (W. Va. 1997) ("Traditionally, West Virginia courts apply the *lex loci delicti* choice-of-law rule; that is, the substantive rights between the parties are determined by the law of the place of injury."). Here, the place of injury is West Virginia. Therefore, the court will apply West Virginia law.

## IV. Analysis

### a. Defamation

First, the defendants argue that they are entitled to summary judgment on the plaintiff's defamation claim. In Count I of the Complaint, the plaintiff alleges that the CBS broadcasts contained both defamatory statements and defamatory implications. The court will address these allegations separately. In West Virginia, the essential elements for a successful defamation action are (1) a defamatory

statement; (2) a nonprivileged communication to a third party; (3) falsity; (4) reference to the plaintiff; (5) negligence or actual malice on the part of the publisher;[7] and (6) resulting injury. *Crump v. Beckley Newspapers, Inc.*, 320 S.E.2d 70, 77 (W. Va. 1983).

### i. Defamatory Statements

The plaintiff alleges that both CBS broadcasts contained defamatory statements. The "court must decide initially whether as a matter of law the challenged statements in a defamation action are capable of a defamatory meaning." *Pritt v. Republican Nat'l Comm.*, 557 S.E.2d 853, 861 (W. Va. 2001). A statement is defamatory "if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Crump*, 320 S.E.2d at 77 (quoting Restatement (Second) of Torts § 559 (1977)). To determine this, the court must "consider whether the allegedly defamatory statements could be construed as statements of opinion. 'A statement of opinion which does not contain a provably false assertion of fact is entitled to full constitutional protection.'" *Pritt*, 557 S.E.2d at 861 (citations omitted). "[W]hether a statement is one of fact or opinion is an issue that must be decided initially by a court." *Id.* (alteration in original).

---

[7] The *mens rea* required varies depending on whether the injured party is a private or public figure. Although the parties dispute whether Mr. Ballengee is a private or public figure, the court finds it unnecessary to reach the issue in order to decide this Motion.

The allegedly defamatory statements appeared in both broadcasts, varying only slightly their wording. The statement at issue from the January broadcast is,

> MR. JIM AXELROD: This pharmacy, Tug Valley, is now being sued for negligently filling prescriptions. Records show Tug Valley was filling more than 150 pain prescriptions a day from one clinic alone.

Jan. Tr. 4–5. From the May broadcast, the following statements are at issue:

> MR. JIM AXELROD: Last winter we traveled to this small Appalachian town where we found Tug Valley Pharmacy, which until January was supplied by McKesson.
>
> Hi. Are you Mr. Ballengee? I'm Jim Axelrod with CBS News.
>
> We discovered that pharmacist Randy Ballengee is facing several lawsuits for negligence, admitting to filling 150 pain prescriptions daily for one clinic alone.

May Tr. 5–6. These statements are not opinions and are capable of harming Mr. Ballengee's reputation and deterring others from associating with him. Therefore, the statements are capable of a defamatory meaning.

Because the allegedly defamatory statements are capable of a defamatory meaning, the court must now analyze the elements of Mr. Ballengee's defamation claim regarding these statements to determine whether there are any genuine disputes of material fact. Because Mr. Ballengee has the burden of proof on each element of his defamation claim, summary judgment is proper if there is no genuine dispute of material fact regarding any one of the required elements. *See Celotex Corp.*, 477 U.S. at 322 ("Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a

showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").

The court will begin with the element of falsity. "The common law of libel takes but one approach to the question of falsity, regardless of the form of the communication. It overlooks minor inaccuracies and concentrates upon substantial truth." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 517 (1991). "Minor inaccuracies do not amount to falsity so long as 'the substance, the gist, the sting, of the libelous charge be justified.'" *Id.* Thus, a "statement is not considered false unless it 'would have a different effect on the mind of the reader from that which the pleaded truth would have produced.'" *Id.* Generally, this "inures to the benefit of the accused, *i.e.* if something is 'substantially' true in overall effect, minor inaccuracies or falsities will not create falsity." *Matter of Callaghan*, 796 S.E.2d 604, 628 (W. Va. 2017).

The defendants argue that Mr. Ballengee has failed to make a showing sufficient to establish falsity because the allegedly defamatory statements are, at best, minor inaccuracies, and thus are substantially true. The first statement at issue appeared in both broadcasts. During the January 7, 2016 broadcast, Mr. Axelrod reported that "[r]ecords show Tug Valley was filling more than 150 pain prescriptions a day from one clinic alone." Jan. Tr. 4. During the May 25, 2016 broadcast, Mr. Axelrod reported "that Randy Ballengee is facing several lawsuits for negligence, admitting to filling 150 pain pill prescriptions daily for one clinic alone." May Tr. 5–6.

The plaintiff claims that these statements are false because he never filled more than 150 pain prescriptions "a day" / "daily" from one clinic alone. Pl.'s Resp. 9. The court disagrees. The defendants submitted records that demonstrate that on at least seven occasions, the plaintiff did fill more than 150 pain prescriptions in a single day from one clinic.[8] The plaintiff does not dispute the accuracy of these records, and did not offer any evidence to rebut them.

A "statement is not considered false unless it 'would have a different effect on the mind of the reader from that which the pleaded truth would have produced.'" *Masson*, 501 U.S. at 517. Here, the pleaded truth, undisputed by the plaintiff, is that, on seven occasions, Tug Valley filled more than 150 pain prescriptions in a single day from one clinic. The allegedly defamatory statement is that "Tug Valley was filling more than 150 pain prescriptions a day / daily from one clinic alone." Thus, based on the undisputed evidence, I conclude that no reasonable juror could find that the broadcast statement "would have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Masson*, 501 U.S. at 517.

---

[8] On January 2, 2008, Tug Valley filled 188 prescriptions for hydrocodone written by two employees of Mountain Medical. Defs.' Mot. Ex. 6-3, at 1–4. On March 10, 2008, Tug Valley filled 157 prescriptions for hydrocodone, 1 prescription for Endocet, 1 prescription for oxycodone, and 1 prescription for Vicodin, all written by a single employee of Mountain Medical. Defs.' Mot. Ex. 7, at 2. On May 5, 2008, Tug Valley filled 177 prescriptions for hydrocodone and 1 prescription for Endocet written by a single employee of Mountain Medical. *Id.* at 1. On May 1, 2009, Tug Valley filled 163 prescriptions for hydrocodone and 2 prescriptions for Lorcet written by two employees of Mountain Medical. Defs.' Mot. Ex. 6-3, at 5–7. On October 30, 2009, Tug Valley filled 151 prescriptions for hydrocodone and 2 prescriptions for Lortab written by three employees of Mountain Medical. *Id.* at 8–10. On December 1, 2009, Tug Valley filled 156 prescriptions for hydrocodone and 1 prescription for Lorcet written by two employees of Mountain Medical. *Id.* at 11–13. Finally, on December 31, 2009, Tug Valley filled 210 prescriptions for hydrocodone and 1 prescription for Lortab written by two employees of Mountain Medical. *Id.* at 14–17.

Therefore, the broadcast statement is "'substantially' true in overall effect," and thus insufficient to create falsity for purposes of the plaintiff's defamation claim. *See Matter of Callaghan*, 796 S.E.2d at 628.

Additionally, the May broadcast stated that Mr. Ballengee *admitted* to filling 150 pain prescriptions daily for one clinic alone. May Tr. 5. This statement refers to Mr. Ballengee's testimony during a deposition in relation to one of the civil lawsuits in which he was a defendant. The relevant portion of the deposition reads as follows:

> Q: Okay. What would be in the ballpark when Dr. Hoover and the Mountain Medical Care Center, LLC, were in their prime, so-to-speak, how many prescriptions would you say you fill in a day from there?
>
> A: It would be an estimate, maybe 150 to 200.
>
>    . . . .
>
> Q: Those would be if not 100 percent controlled substances, certainly a large part of that 150 would be for controlled substances, wouldn't it?
>
> A: Most of their patients got more than just pain medication and nerve medication.
>
> Q: I understand, but virtually, everyone of them got some pain medication, didn't they?
>
> A: Most of them did.

Defs.' Mot. Ex. 2, at 5–8.

The court agrees with the plaintiff that he did not literally state in his deposition that he was filling 150 pain prescriptions daily for one clinic alone. Instead, he stated that he was filling between 150 and 200 prescriptions in a day from Mountain Medical, and that most of those patients received pain medication. Again,

based on the undisputed evidence, I conclude that no reasonable juror could find that the broadcast statement "would have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Masson*, 501 U.S. at 517. Therefore, the broadcast statement is "'substantially' true in overall effect," and thus insufficient to create falsity for purposes of the plaintiff's defamation claim. *See Matter of Callaghan*, 796 S.E.2d at 628.

Falsity is a required element of Mr. Ballengee's defamation claim, and he bears the burden of proof on this element. Mr. Ballengee failed to offer any evidence from which a reasonable juror could find that the allegedly defamatory statements in the CBS broadcasts are false, rather than minor inaccuracies. Because there is no genuine dispute of material fact regarding the falsity of the allegedly defamatory statements, summary judgment on this claim is proper. *See Celotex Corp.*, 477 U.S. at 322 ("Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").

### ii. Defamatory Implications

Mr. Ballengee further alleges that the CBS broadcasts contained three defamatory implications:

> (1) the Plaintiff or his pharmacy was sued by the State of West Virginia, (2) the Plaintiff was criminally charged or was currently under investigation by the State of West Virginia or by federal authorities relating to him operating

a Pharmacy, and (3) the Plaintiff intentionally acted illegally, acted immorally, and/or contributed to the opioid epidemic for profit.

Pl.'s Resp. 16–17.

Defamation may be accomplished through a direct statement, inference, implication, innuendo, or insinuation. *Crump*, 320 S.E.2d at 77. Before addressing whether an alleged implication is defamatory, the court first must determine whether the implication is in fact present. "A defamatory implication must be present in the plain and natural meaning of the words used." *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092 (4th Cir. 1993). "[B]ecause the constitution provides a sanctuary for truth," a plaintiff alleging defamation by implication "must make an especially rigorous showing where the expressed facts are literally true." *Id.* at 1092–93. The language must (1) be reasonably understood to impart the false innuendo, and (2) affirmatively suggest that the author intends or endorses the inference. *Id.* at 1093.

The first alleged implication is that Mr. Ballengee or his pharmacy was sued by the State of West Virginia. Pl.'s Resp. 17. The plaintiff notes that the January broadcast references several civil lawsuits in which Mr. Ballengee and/or Tug Valley were named as defendants, but the broadcast fails to mention that the lawsuits were filed by former customers of Tug Valley—not the State of West Virginia. Jan. Tr. 3. Mr. Pelley begins the broadcast by stating that "the State is suing, accusing pharmacies and drug distribut[o]rs of making millions pushing narcotics to anyone who wants them." Jan. Tr. 3. A short time later, Mr. Axelrod discusses the lawsuits that were filed against Mr. Ballengee, without stating who was suing him. *Id.* at 4–

5. A few lines after that, Mr. Axelrod mentions "the unprecedented lawsuit" in which the State is suing eleven defendants. *Id.* at 5–6. The broadcast, however, only names one of those defendants—AmerisourceBergen. *Id.* This series of statements creates a genuine dispute of material fact as to whether the broadcast could be reasonably understood to impart that Tug Valley was sued by the State of West Virginia, and whether the broadcast affirmatively suggests that CBS intended or endorsed the inference. *See Chapin*, 993 F.2d at 1093. Therefore, because a reasonable juror could find that the January broadcast implied that Mr. Ballengee and/or Tug Valley were being sued by the State of West Virginia, the court will now determine whether a reasonable juror could find that this implication defamed Mr. Ballengee.

As an initial matter, the court finds that the implication that Mr. Ballengee and/or Tug Valley were being sued by the State of West Virginia is not an opinion, and is capable of a defamatory meaning. *See Pritt*, 557 S.E.2d at 861. Therefore, the court will now turn to the elements of Mr. Ballengee's defamation claim regarding this implication to determine whether there are any genuine disputes of material fact.

The court will again begin with the element of falsity. The parties agree that the State of West Virginia did not sue Mr. Ballengee or Tug Valley. However, the defendants submitted evidence that shows that the State of West Virginia did sue eleven pharmaceutical drug distributors for contributing to the prescription drug abuse problem in West Virginia. Defs.' Mot. Ex. 41, at 4. Although the State did not name any pharmacies, including Tug Valley, as defendants in the lawsuit, it

discussed several pharmacies' practices in its complaint. Specifically, the State

described Tug Valley's relationship with AmerisourceBergen as such:

> Amerisourcebergen was a distributor of substantial
> quantities of controlled substances to Tug Valley Pharmacy
> in Williamson, West Virginia. This pill mill pharmacy was
> located within yards of two notorious pill mill physicians
> and their operations in the town of Williamson. Doctors . . .
> operated pill mill clinics whose voluminous illegal
> prescriptions written for non-medical purposes were filled
> daily by this pharmacy to which Amerisourcebergen was
> distributing. . . . [T]hey distributed to Tug Valley Pharmacy
> a total of 149,300 hydrocodone (generic of Lorcet, Lortab,
> Vicodin Vicoprofen, among others) tablets during the
> calendar year 2009 for an average supply of 12,441 tablets
> per month.

*Id.* at 16. The State also described Tug Valley's relationship with H.D. Smith

Wholesale Drug Co. as such:

> [H.D. Smith] made substantial distributions to West
> Virginia pharmacies of controlled substances widely
> known to be among those substances which were abused,
> including . . . Tug Valley Pharmacy. . . . These pharmacies
> were among the most notorious of the pill mill pharmacies
> in Southern West Virginia.
>
>     . . . .
>
> [H.D. Smith's] distributions to Tug Valley were
> suspiciously high when standing alone and more so when
> considered together with the distributions to Hurley [Drug
> Co., a pharmacy located only four blocks away from Tug
> Valley in Williamson]. For example, according to [H.D.
> Smith's] records, on October 18, 2007, H.D. Smith
> distributed 30,000 hydrocodone . . . tablets to Tug Valley
> Pharmacy. On October 16, 2007, H.D. Smith delivered
> 5000 hydrocodone . . . to Hurley drug. Then on October 18,
> 2007, H.D. Smith delivered another 4000 hydrocodone . . .
> to Hurley resulting in a total 39,000 hydrocodone delivered

within a two (2) day period to a four (4) block area in a town which had a population of 3090 people.

The volume of oxycodone and hydrocodone pills distributed to Tug Valley Pharmacy by H.D. Smith in view of the town's population, the close proximity to pill-pushing physicians whose reputations were both well-known and the subject of extensive publicity, the close proximity to another pharmacy, existence of other suppliers of controlled substance to this same pharmacy, all should have served to alert a distributer acting with due diligence that the orders were suspicious in nature.

*Id.* at 32–38.

Although Mr. Ballengee may dispute these characterizations of Tug Valley by the State of West Virginia, he does not dispute that the characterizations did in fact appear in West Virginia's complaint against the drug distributors. Thus, the pleaded truth, undisputed by the plaintiff, is that the State of West Virginia did not sue Mr. Ballengee or Tug Valley, but it did describe Tug Valley as "among the most notorious of the pill mill pharmacies in Southern West Virginia," and described in detail some of Tug Valley's concerning practices regarding the distribution of narcotics.

Based on the undisputed evidence, I conclude that no reasonable juror could find that the implication that the State of West Virginia was suing Mr. Ballengee or Tug Valley "would have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Masson*, 501 U.S. at 517; *see also Walters v. City of Kenova*, No. 17-0451, 2018 WL 2174129, at *4 (W. Va. May 11, 2018) (affirming trial court's grant of summary judgment on the basis that it was a minor inaccuracy for the defendant to publish that the plaintiff was arrested for unlawful

possession of cocaine or crack cocaine when the plaintiff was arrested for unlawful possession of hydrocodone). Additionally, no reasonable juror could find that "the substance, the gist, the sting, of the" implication is not justified by the undisputed facts. *See Masson*, 501 U.S. at 517. Therefore, the implication is "'substantially' true in overall effect," and thus insufficient to create falsity for purposes of the plaintiff's defamation claim. *See Matter of Callaghan*, 796 S.E.2d at 628.

As with Mr. Ballengee's defamation claim based on defamatory statements, falsity is a required element of his defamation-by-implication claim, and he bears the burden of proof on this element. Mr. Ballengee failed to offer any evidence from which a reasonable juror could find that the allegedly defamatory implication is false, rather than a minor inaccuracy. Because there is no genuine dispute of material fact regarding the falsity of the allegedly defamatory implication, summary judgment on this claim is proper. *See Celotex Corp.*, 477 U.S. at 322 ("Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."); *see also Walters*, 2018 WL 2174129, at *4 ("Having drawn any permissible inferences from the underlying facts in the light most favorable to petitioner, we concur with the circuit court's finding that petitioner's defamation claim fails as a matter of law because petitioner cannot establish the falsity element of his claim.").

The second alleged implication is that Mr. Ballengee was criminally charged or was currently (at the time of the broadcast) under investigation by the State of West Virginia or by federal authorities. Pl.'s Resp. 17–20. According to the plaintiff, this can be implied from the following portion of the January broadcast:

> MR. JIM AXELROD: More than three million doses of hydrocodone were ordered by a Kermit pharmacist, James Wooley. In one year he paid drug distributers [sic] hundreds of thousands of dollars while netting more than six million dollars in profit.
>
> In 2012, Wooley *lost his license and served six months in prison* for illegally dispensing drugs. But Cagle told us the *problem persists*. This pharmacy, Tug Valley, is now being *sued* for *negligently* filling prescriptions. Records show Tug Valley was filling more than 150 pain prescriptions a day from one clinic alone.
>
> Hi. Are you Mr. Ballengee? I'm Jim Axelrod with CBS News.
>
> We decided to ask owner Randy Ballengee about the *charges*.
>
> So you're named in a *lawsuit* alleging *substandard care*.
>
> MR. RANDY BALLENGEE: Right.

Jan. Tr. 4–5 (emphasis added).

The plaintiff points to the fact that the defendants describe the criminal charges against Mr. Wooley and then "[a]bruptly . . . show Tug Valley Pharmacy with the Plaintiff's name on the window, stating, 'but Cagle told us the problem persists. This pharmacy, Tug Valley, is now being sued for negligently filling prescriptions.'" Pl.'s Resp. 18. According to the plaintiff, "a reasonable viewer could easily think that

the problem referred to is the illegal actions of Mr. Wooley." *Id.* at 19. He also points to the fact that the defendants used the word "charges" when describing his civil lawsuits. *Id.* at 18.

The plaintiff's arguments are unpersuasive. "A defamatory implication must be present in the plain and natural meaning of the words used." *Chapin*, 993 F.2d at 1092. The broadcast must be "reasonably read to impart the false innuendo." *Id.* at 1093. The January broadcast discussed West Virginia's problems with opioid pain prescriptions. Jan. Tr. 3. Mr. Axelrod's opening remarks begin, "No state has had more trouble with prescription pain[] pills than West Virginia . . . ." *Id.* Mr. Axelrod then discusses the criminal charges filed against Mr. Wooley and then the civil lawsuits filed against Mr. Ballengee. *Id.* at 3–7. No reasonable juror could find that Mr. Axelrod's statement that "the problem persists" could be reasonably understood to refer to criminally charged pharmacists. When viewing the broadcast as a whole, the only rational interpretation of "the problem" for any reasonable trier of fact is that it refers to the State's problem with opioid pain prescriptions.

Additionally, when discussing Mr. Ballengee, Mr. Axelrod says, "Tug Valley, is now being *sued* for *negligently* filling prescriptions," and Mr. Ballengee is "named in a *lawsuit* alleging *substandard care*." *Id.* at 4 (emphasis added). The plain and natural meaning of the words used is that Mr. Ballengee was named in a civil action. And, as the plaintiff himself admits, this is in fact true. *See* Pl.'s Resp. 2 ("In 2010, 2011, and 2012, the Plaintiff and Tug Valley Pharmacy were named in multiple civil

suits filed by former customers of Tug Valley Pharmacy alleging that the Plaintiff was negligently filling prescriptions.").

Therefore, no reasonable juror could find that the use of the word "charges" in this context could be reasonably understood to imply that Mr. Ballengee was facing *criminal* charges. *See Chapin*, 993 F.2d at 1093. Moreover, given the numerous references to Mr. Ballengee's involvement in *civil* lawsuits, no reasonable juror could find that the language of the broadcast affirmatively suggests that CBS intended or endorsed the inference that Mr. Ballengee was *criminally* charged. *See id.* Thus, Mr. Ballengee has failed to produce evidence from which a reasonable juror could find that the *Chapin* elements are satisfied regarding the implication that he was criminally charged or under investigation. Because no reasonable juror could find that the CBS broadcasts contained this implication, summary judgment is proper.

The final alleged implication is that Mr. Ballengee "intentionally acted illegally, acted immorally, and/or contributed to the opioid epidemic for profit." Pl.'s Resp. 16–17. As an initial matter, it would not be defamatory for CBS to imply that Mr. Ballengee acted immorally. "A statement of opinion which does not contain a provably false assertion of fact is entitled to full constitutional protection." *Pritt*, 557 S.E.2d at 861. Whether someone acted immorally is a matter of opinion. Therefore, this alleged implication is not capable of a defamatory meaning, and cannot serve as the basis of a defamation claim.

Next, the court will assume without deciding that the CBS broadcasts contain the implication that Mr. Ballengee "contributed to the opioid epidemic for profit." However, the defendants have submitted numerous pieces of evidence to show that this implication is substantially true, and the plaintiff has not submitted any evidence to the contrary. For example, the defendants submitted evidence that Mr. Ballengee admitted that when he opened Tug Valley, he was aware that Mountain Medical and Dr. Shafer's office—two notorious pill mills—were within walking distance of his pharmacy. Defs.' Mot. Ex. 3, at 5–6. Mr. Ballengee was aware that patients frequently lined up outside of Mountain Medical before it opened to wait for prescriptions. Defs.' Mot. Ex. 2, at 6–7. Although Mr. Ballengee was aware of this problematic behavior, he never questioned the office's practices. Instead, he filled huge quantities of prescriptions for controlled substances coming from Mountain Medical, and many other offices, in a town with a population of 3090. Defs.' Mot. Ex. 6.

In 2008, Tug Valley filled 10,195 controlled substance prescriptions written by Dr. Shafer, and 11,111 controlled substance prescriptions written by doctors at Mountain Medical. *Id.* In 2009, Tug Valley filled 17,055 prescriptions for controlled substances written by Dr. Shafer, and 29,027 prescriptions for controlled substances written by doctors at Mountain Medical. *Id.* In 2009, Tug Valley filled 42,115 hydrocodone prescriptions. This averages to 162 prescriptions per business day, which was more than enough to give every man, woman, and child in Williamson a

hydrocodone prescription every month of the year. Agencies eventually closed Mountain Medical and Dr. Shafer's offices for improper prescription practices. Defs.' Mot. Ex. 22, at 3; Defs.' Mot. Ex. 2, at 6; *Tug Valley Pharmacy, LLC*, 773 S.E.2d at 629. Dr. Shafer surrendered her license to practice medicine and was sentenced to six months in federal prison for her practices. Defs.' Mot. Ex. 22, at 3.

Sula Collins, who had her prescriptions filled at Tug Valley from Mountain Medical for approximately four years, Defs.' Mot. Ex. 15, at 3, described her experience at Tug Valley as such:

> So I would go in and I would wait for so long. And there were so many people. I mean, there was such a line. And there were people coming in from everywhere. I mean, I noticed and I heard there were people coming from like Ohio. There were people coming in from like way over in West Virginia. I can't remember the name of it. And there were people slumped over. I mean, totally out of their mind. I know when I seen them, somebody like that, I know . . . . And they were just like selling drugs outside the place . . . . I kept hearing people, you know, stating where they can get this and that and how much for.

Defs.' Mot. Ex. 18, at 12. Another customer testified that he also saw drug deals occur right outside of Tug Valley, and that Tug Valley would fill narcotic prescriptions before the refill date, particularly if the customer paid in cash. *Id.* at 13.

Finally, Mr. Ballengee himself admits that his salary as a full-time pharmacist and pharmacy owner was $290,000.00 in 2015 before the broadcasts. Compl. ¶ 159.

Thus, I conclude that no reasonable juror could find that "the substance, the gist, the sting, of the" implication that Mr. Ballengee contributed to the opioid epidemic for profit is not justified by the undisputed facts. *See Masson*, 501 U.S. at

517. Therefore, the implication is "'substantially' true in overall effect," and thus insufficient to create falsity for purposes of the plaintiff's defamation claim. *See Matter of Callaghan*, 796 S.E.2d at 628.

The only remaining issue is whether CBS implied that Mr. Ballengee intentionally acted illegally. Just as the court found that Mr. Ballengee has failed to produce evidence from which a reasonable juror could find that the *Chapin* elements are satisfied regarding the implication that he was criminally charged or under investigation, the court similarly finds that there is no evidence from which a reasonable juror could find that the *Chapin* elements are satisfied regarding the implication that he "intentionally acted illegally." Because no reasonable juror could find that the CBS broadcasts contained this implication, summary judgment is proper.

In summary, the plaintiff failed to offer more than a mere scintilla of evidence that any of the allegedly defamatory statement or implications were false, rather than minor inaccuracies. Falsity is a required element of the plaintiff's defamation claim (including defamation by implication), and he bears the burden of proof. Because he failed to establish that there is a genuine dispute of material fact as to this required element, summary judgment on the plaintiff's defamation claim is proper. *See Celotex Corp.*, 477 U.S. at 322–23 ("[T]here can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.").

### b. False Light Invasion of Privacy

Next, the defendants argue that they are entitled to summary judgment on the plaintiff's claim for false light invasion of privacy. In Count II of the Complaint, the plaintiff alleges that the CBS broadcasts portrayed him in a false light that would be highly offensive to a reasonable person. Compl. ¶¶ 192–93.

"[P]ublicity which unreasonably places another in a false light before the public is an actionable invasion of privacy." *Crump*, 320 S.E.2d at 86. "A plaintiff states a claim for false light invasion of privacy when he demonstrates publicity which places him in a false light before the public." *Bell v. Nat'l Republican Cong. Comm.*, 187 F. Supp. 2d 605, 617 (S.D. W. Va. 2002). "[C]ourts and commentators have consistently treated false light privacy claims in essentially the same manner as they have treated defamation." *Crump*, 320 S.E.2d at 87. This is because there are "a number of similarities between actions for false light invasion of privacy and actions for defamation." *Id.* Like in defamation claims, "the matter publicized as to the plaintiff must be untrue." *Id.*

As described in detail above, the plaintiff failed to provide any evidence from which a reasonable juror could find that the statements and implications in the CBS broadcasts were false. Because falsity is a necessary element of both defamation and false light invasion of privacy, the plaintiff's false light claim fails as well. *See Celotex Corp.*, 477 U.S. at 322–23.

### c. Tortious Interference

Next, the defendants argue that they are entitled to summary judgment on the plaintiff's claim for tortious interference with a contract or prospective business relationship. In Count III of the Complaint, the plaintiff alleges that the defendants tortiously interfered with various contracts and prospective business relationships, and as a result he suffered damages. Compl. ¶¶ 208–29.

> To establish prima facie proof of tortious interference, a plaintiff must show:
>
> (1) existence of a contractual or business relationship or expectancy;
>
> (2) an intentional act of interference by a party outside that relationship or expectancy;
>
> (3) proof that the interference caused the harm sustained; and
>
> (4) damages.
>
> If a plaintiff makes a prima facie case, a defendant may prove justification or privilege, affirmative defenses. Defendants are not liable for interference that is negligent rather than intentional, or if they show defenses of legitimate competition between plaintiff and themselves, their financial interest in the induced party's business, their responsibility for another's welfare, their intention to influence another's business policies in which they have an interest, their giving of honest, truthful requested advice, or other factors that show the interference was proper.

*Tiernan v. Charleston Area Med. Ctr., Inc.*, 506 S.E.2d 578, 591–92 (W. Va. 1998) (quoting *Torbett v. Wheeling Dollar Sav. & Tr. Co.*, 314 S.E.2d 166, 167 (1983)).

The Restatement (Second) of Torts further provides, "Since interference with contractual relations is an intentional tort, . . . the injured party must show that the interference with his contractual relations was either desired by the actor or known by him to be a substantially certain result of his conduct." Restatement (Second) of Torts § 767, cmt. d; *see also Torbett*, 314 S.E.2d at 171–72 (citing § 767 and noting that the Supreme Court of Appeals of West Virginia has "relied upon the Restatement for guidance in outlining elements of and defenses to improper interference but, of course, [is] not tied to its categories and definitions"). Furthermore, "truthful information is an absolute bar to a claim of tortious interference 'whether or not the information is requested.'" *Tiernan*, 506 S.E.2d at 593 (quoting Restatement (Second) of Torts § 772, cmt. b).

Mr. Ballengee identifies two contracts and one prospective business relationship with which he claims the defendants tortiously interfered. First, Mr. Ballengee claims that, due to the allegedly defamatory broadcasts, he was forced to breach and renegotiate a contract with his ex-wife concerning alimony and child support. Compl. ¶ 214. Mr. Ballengee does not provide any further details on how the broadcasts allegedly caused him to breach his contract with his ex-wife.

Regarding this first contract, Mr. Ballengee has produced no evidence from which a reasonable juror could find "that the interference with his contractual relations was either desired by the actor or known by him to be a substantially certain result of his conduct." Restatement (Second) of Torts § 767, cmt. d. In fact, there is no

evidence to suggest that the defendants were even aware of Mr. Ballengee's contract with his ex-wife. Therefore, Mr. Ballengee has offered no evidence that the defendants *intentionally* interfered with this contract.

Second, Mr. Ballengee claims that the allegedly defamatory broadcasts caused McKesson to terminate its supply agreement with Tug Valley Pharmacy. Compl. ¶ 213. However, the affidavit of Mr. Boggs, Senior Director of Regulatory Affairs at McKesson, shows otherwise. In the affidavit, Mr. Boggs states that the January broadcast "alerted [him] that Tug Valley Pharmacy was a defendant in a lawsuit in Mingo County that alleged that Tug Valley Pharmacy contributed to the plaintiffs' addictions by dispensing high volumes of controlled substances." Boggs Aff. ¶ 12. This "prompted [Mr. Boggs] to initiate a review of Tug Valley Pharmacy." *Id.* ¶ 13. As part of this review, Mr. Boggs read the plaintiffs' brief in the customers' lawsuit against Tug Valley. *Id.* ¶ 14. From reading the brief, Mr. Boggs learned "that Tug Valley Pharmacy's owner, Samuel Ballengee, testified that he filled more than 150 prescriptions daily from one pain clinic alone." *Id.* "Based upon the totality of the facts and circumstances, [Mr. Boggs] determined that McKesson had a good-faith belief that continued shipments to Tug Valley Pharmacy put McKesson 'in jeopardy of being noncompliant' with federal and/or state laws and regulations concerning the distribution of controlled substances." *Id.* ¶ 16. Thus, "[o]n January 8, 2016, McKesson determined to immediately terminate shipments of controlled substances to Tug Valley Pharmacy and notified Mr. Ballengee of the determination." *Id.* ¶ 17.

Mr. Boggs's affidavit shows that the only information he learned from the January broadcast was that "Tug Valley Pharmacy was a defendant in a lawsuit in Mingo County that alleged that Tug Valley Pharmacy contributed to the plaintiffs' addictions by dispensing high volumes of controlled substances." *Id.* ¶ 12. Any other information that may have influenced McKesson's decision to terminate its supply agreement with Tug Valley was learned through Mr. Boggs's independent review of the brief in the customers' lawsuits.

Mr. Ballengee does not dispute this evidence. In fact, Mr. Ballengee submitted additional evidence, in the form of deposition testimony from Mr. Boggs, that confirms his statements in the affidavit. *See* Notice of Filing & Mot. to Seal Dep. of Gary Boggs Ex. A, at 47:12–16 [ECF No. 216-1]. During his deposition in this case, Mr. Boggs confirmed that the decision to terminate Tug Valley's contract was based on his review of various court documents in the customers' lawsuit, not the broadcast: "I based my decision on going and reviewing the court documents and the respondent's briefs and it was information contained in the respondent's briefs that specifically led to my determination." *Id.*

Importantly, the single piece of information that Mr. Boggs attributes to the January broadcast—"that Tug Valley Pharmacy was a defendant in a lawsuit in Mingo County that alleged that Tug Valley Pharmacy contributed to the plaintiffs' addictions by dispensing high volumes of controlled substances"—is true, and Mr. Ballengee does not argue to the contrary. *See* Pl.'s Resp. 2 ("In 2010, 2011, and 2012,

the Plaintiff and Tug Valley Pharmacy were named in multiple civil suits filed by former customers of Tug Valley Pharmacy alleging that the Plaintiff was negligently filling prescriptions."). "[T]ruthful information is an absolute bar to a claim of tortious interference 'whether or not the information is requested.'" *Tiernan*, 506 S.E.2d at 593 (quoting Restatement (Second) of Torts § 772(a), cmt. b). Therefore, Mr. Ballengee has offered no evidence from which a reasonable juror could find that the defendants tortiously interfered with his contract with McKesson.

Finally, Mr. Ballengee claims that the defendants tortiously interfered with his prospective employment relationships after he lost his job at Tug Valley Pharmacy. Compl. ¶ 211. Specifically, Mr. Ballengee claims that, due to the defendants' allegedly defamatory broadcasts, he was unable to secure employment as a pharmacist with Wal-Mart, even though he had worked there for approximately fifteen years prior to opening Tug Valley. Pl.'s Resp. 36. Again, Mr. Ballengee has produced no evidence from which a reasonable juror could find "that the interference with his contractual relations was either desired by the actor or known by him to be a substantially certain result of his conduct." Restatement (Second) of Torts § 767, cmt. d. There is no evidence to suggest that, at the time of the allegedly defamatory broadcasts, the defendants were aware of Mr. Ballengee's anticipated employment with Wal-Mart. Therefore, Mr. Ballengee has offered no evidence that the defendants *intentionally* interfered with this prospective business relationship.

In summary, Mr. Ballengee has offered no evidence from which a reasonable juror could find a prima facie case of tortious interference with his divorce agreement with his ex-wife, his supply agreement with McKesson, or his anticipated employment with Wal-Mart. Accordingly, the defendants are entitled to judgment as a matter of law on Mr. Ballengee's tortious interference claim, and summary judgment is proper.

### d. Intentional Infliction of Emotional Distress

Finally, the defendants argue that they are entitled to summary judgment on the plaintiff's claim for intentional infliction of emotional distress ("IIED"). In Count IV of the Complaint, the plaintiff alleges that defendants "intentionally caus[ed] false information to be published about the Plaintiff," and that this "constitutes conduct that is atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency." Compl. ¶ 231.

In West Virginia, the plaintiff must prove the following elements in order to recover for IIED:

> (1) that the defendant's conduct was atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency; (2) that the defendant acted with the intent to inflict emotional distress, or acted recklessly when it was certain or substantially certain emotional distress would result from his conduct; (3) that the actions of the defendant caused the plaintiff to suffer emotional distress; and (4) that the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it.

*Travis v. Alcon Labs., Inc.*, 504 S.E.2d 419, 425 (W. Va. 1998).

39

"Whether conduct may reasonably be considered outrageous is a legal question, and whether conduct is in fact outrageous is a question for jury determination." *Id.* at 428. In order for conduct to be considered outrageous, it must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Harless v. First Nat'l Bank in Fairmont*, 289 S.E.2d 692, 705 (W. Va. 1982).

Here, the defendants thoroughly investigated the opioid epidemic in West Virginia, an epidemic that has greatly harmed the State. Thereafter, they aired four broadcasts reporting on their findings, two of which mentioned the plaintiff. Jan. Tr.; May Tr. These broadcasts were not only tolerable—they were applaudable. The people of West Virginia, indeed those all over the country, deserve to know about the evolution of the opioid epidemic and the identities of the bad actors. While the plaintiff clearly would have preferred not to be used as an example of one of the bad actors, the defendants did not engage in conduct that was "atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency." *Travis*, 504 S.E.2d at 425; *see Korstenko v. CBS Evening News*, 265 F. Supp. 3d 672, 683 (S.D. W. Va. 2017) ("The news pieces included [the plaintiff] as an example of a doctor being investigated for improper prescription practices, and the April 2016 piece discussed patients who died of drug overdoses under his care. Substantially accurate reports on those matters do not constitute extreme and outrageous conduct under West Virginia law.").

Therefore, the defendants are entitled to summary judgment on the plaintiff's IIED claim.

## V. Conclusion

For the reasons stated herein, the Defendants' Motion for Summary Judgment [ECF No. 169] is **GRANTED**. The court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party. The court further **DIRECTS** the Clerk to post a copy of this published opinion on the court's website, www.wvsd.uscourts.gov.

ENTER: August 21, 2018

JOSEPH R. GOODWIN
UNITED STATES DISTRICT JUDGE